843 A.2d 93

**Derrick BERRY, et al.**

v.

**STATE of Maryland.**

**No. 2094, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Feb. 26, 2004.

146

148

Michael R. Braudes (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Devy Patterson Russell (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., KRAUSER, and BARBERA, JJ.

BARBERA, Judge.

In the summer and fall of 2000, Baltimore City police were investigating a narcotics distribution organization that appeared to be centered at 915 North Patterson Park Avenue. The investigators used wiretaps on numerous telephone lines, including cellular telephones, some of which were registered to fictitious persons, at non-existent addresses. The investigators used the information garnered from thousands of telephone conversations as a basis for surveillance, traffic stops, and, ultimately, a series of raids on various locations. The investigation led to the arrest of appellants Derrick Berry, Eric Berry, Eric Buckson, William Downing, and Raul Varela.

Appellants were tried jointly and all were convicted of multiple counts of conspiracy: to distribute cocaine, to possess cocaine with the intent to distribute it, and to possess cocaine. Appellant Varela was also convicted of being a drug kingpin in the conspiracy, two counts of possession of cocaine, importing cocaine into Maryland, and possession of 448 grams or more of cocaine with the intent to distribute it.[1]

In this appeal, all five appellants raise the following issues:

I. Did the trial court err in refusing to instruct the jury that a relationship of buyer and seller of a controlled substance does not establish a conspiracy?

---

1. A sixth defendant, Antoine Rich, was tried with appellants and was acquitted.

II. Did the trial court err in reseating a prospective juror who had been the subject of a peremptory challenge by the defense?

III. Did the trial court err in excluding evidence that a judge had previously found two police witnesses not to be credible?

IV. Did the trial court err in admitting evidence of the arrests of individuals alleged to be part of the conspiracy but not joined for trial with appellants?

V. Were appellants deprived of a fair trial by the admission into evidence of a gun seized from a car allegedly driven by appellant Buckson, and by the accompanying comments of the prosecutor?

VI. Was the evidence legally insufficient to sustain more than one count of conspiracy for each appellant?

Appellant Derrick Berry also asks:

VII. Did the trial court err in denying a motion to suppress currency seized from him?

And appellant Varela asks:

VIII.Was the evidence insufficient to justify his conviction and sentence as a "drug kingpin"?

## FACTS

The evidence at the nearly-month-long trial included wire-tapped telephone conversations between appellants Buckson and Downing, Buckson and Derrick Berry, Buckson and Eric Berry, Downing and Derrick Berry, Derrick Berry and his twin brother, Eric, and Derrick Berry and Keith Demley, the last of whom testified that he was the middleman between the Baltimore organization and Varela, a New York supplier. Some conversations involved more than two appellants.

In addition to the wiretapped conversations, police observed meetings between and among some of the appellants. For example, on August 17, 2000, the Berry brothers were seen with Buckson in the 900 block of North Patterson Park Avenue. On September 1, Downing was seen leaving 915

North Patterson Park Avenue, as was Eric Berry, who stood on the steps of that house with Buckson. The next day, the same group was seen at that house.

Detective William Bristol was accepted as an expert in the identification, packaging, and distribution of controlled dangerous substances, particularly in Baltimore City, as well as the structure of drug organizations, and the terminology of the trade. Detective Bristol testified that many seemingly innocent references in the wiretapped conversations actually referred to drug transactions. For example, Detective Bristol described the tendency of drug dealers to use a middleman to negotiate with several sources for the best price for a large amount of cocaine. In this context, he interpreted a telephone call between appellant Buckson and a man named Donnell Booker as follows: "Powder or ready" referred to whether the substance would be supplied in the form of hydrochloric cocaine or cocaine base; "yeah, straight" referred to cocaine that was not cooked; and "thirteen and a half" ounces was the amount for which he was asking the price. Thirteen and a half ounces was worth approximately $10,400.00. Ending a conversation with the phrase, "Let me call my man," indicated that the speaker was working in conjunction with others.

According to Detective Bristol, high quality cocaine was designated by nicknames such as "love" or "lake trout"; "put it into work" or "put it together" referred to packaging the drug; "wrapped up tight" meant an entire kilogram, or approximately 36 ounces. And "take 5 and put it in the refrigerator" referred to the practice of hiding drugs among ordinary refrigerated items.

Detective Bristol also interpreted terms relating to the business aspects of the operation. For example, in conversations between appellants Buckson and Derrick Berry, "like 450 or something" related to the then-current price for a half-ounce of cocaine, $450.00 to $500.00; and Berry's direction that Buckson "start doing those halfs [sic] for five if they don't get the whole thing" meant that he should start selling half-ounce quantities for $500.00 if the buyers did not purchase a

whole ounce. The profit on half-ounce quantities was greater, and a discount was given on sales of whole ounces.

In mid-July 2000, the police intercepted a series of communications between Demley and appellant Derrick Berry, leading the police to think that a major drug transaction was about to occur. Demley lived in New York, but came to Baltimore regularly on drug business, staying at an apartment on Washington Street. That summer, he came to Baltimore to sell drugs for appellant Varela to pay off a debt from a previous drug transaction.

Appellant Varela picked up Demley's wife and children in New York and drove them to Maryland. Demley saw this as an effort to intimidate him. Varela booked three rooms at the Best Inn, one for himself, one for another man, and one for Demley's family. He gave Demley a Buick equipped with a hidden compartment containing four kilograms of cocaine, and showed him how to operate the trap door.

Demley arranged a meeting with Derrick Berry and sold him the first of the four kilograms of cocaine. Demley took $21,000.00 in cash back to Varela, who was waiting at the motel. Demley and Derrick Berry engaged in two more transactions. Demley had turned over $50,000.00 to $58,000.00 by the time he was arrested on July 21, 2000.

Demley consented to a search of the car at the time of arrest, relying on the trap door to deceive police. But after a drug-sniffing dog alerted, he showed the police how to operate the trap door. A search of the car revealed approximately one and a half kilograms of cocaine and approximately $60,000.00 in cash.

Demley agreed to assist the police in their investigation.[2] In their presence, he made a series of calls to Derrick Berry and arranged to sell him $21,000.00 worth of cocaine on July

---

2. Pursuant to a plea agreement, Demley pleaded guilty to importation of drugs and possession with the intent to distribute drugs, with the expectation that he would receive consideration at sentencing for cooperating in the instant case.

21, 2000, at the Moravia Road McDonald's. Police watched the meeting in the McDonald's parking lot, and approached when Derrick Berry held up a bag and displayed it to Demley. Demley was taken back into custody, but Derrick Berry was allowed to leave after police seized the bag, which contained $26,320.00 in cash.

Meanwhile, other officers were involved in conducting surveillance of the motel where Demley's family and Varela were staying. Detective Keith Gladstone located a car with New York license plates outside of the motel and followed the two men who drove it away. The car was stopped on Moravia Road, at Sinclair Lane. The driver was Andre Nalan and the passenger was appellant Varela. Varela gave his name as "Darelb." Detective Gladstone obtained consent to search the car and found motel receipts for room 402 in the name of Paul Darelb, room 412 in the name of Andres Edwardo, and room 426 in the name of Martinez Marita.

Detective Gladstone and Detective Sergeant Tracy Geho went back to the motel. There, Varela's wife or girlfriend, Martha Consales, let them enter and search room 402. A plastic bag containing papers in Varela's name and approximately $59,000.00 in cash were found in that room.

On July 24, 2000, police intercepted a call between appellant Buckson and a man named Harvey Bruer, and observed their subsequent meeting and what they believed to be a drug transaction. When Buckson drove away, the police attempted to stop him for a traffic violation. Buckson fled, hitting several cars before he abandoned his vehicle and escaped on foot. His own car caught fire. After the fire was extinguished, police searched the car and found a .38 caliber Derringer handgun and a bag of empty gel caps.

In early September 2000, the investigation concluded with nearly simultaneous raids on numerous properties that had been mentioned in the wiretapped conversations, or were places where appellants and their associates had been seen. We summarize below some of the most significant raids.

Late in the evening of September 1, police began a raid on 915 North Patterson Park Avenue, where they recovered drug paraphernalia, packaging materials and equipment, and papers in the name of appellant Eric Berry. Earlier that evening, police had seen appellants Downing and Buckson at that address. The two men were together in Downing's car for two blocks, then Buckson exited the vehicle. Downing's car was followed and stopped. After a struggle, Downing was subdued, and police recovered a bag of suspected cocaine from his waistband.

On September 6, police raided 3525 Pelham Avenue, where appellant Derrick Berry lived with his girlfriend. The police recovered approximately $25,000.00, which Derrick Berry said was drug money. In addition, Derrick Berry told police of the involvement of his aunt, Andrea Dias. Police then searched Dias's home at 3113 Kentucky Avenue and recovered $27,400.00.

Also on September 6, the police raided 749 Exeter Hall, and seized papers, telephones, and $418.00 from a bedroom where Buckson was found. Shannell Myles was at 2932 West Cold Spring Lane when the police arrived and found approximately 60 bags of suspected cocaine, as well as documents naming both Myles and Buckson.

Additional facts will be supplied as pertinent to our discussion of the issues.

## DISCUSSION

### I.

Appellants first argue that the trial court erred in refusing to instruct the jury that a relationship between the buyer and seller of a controlled substance does not establish a conspiracy.[3] There was no error.

---

3. Counsel for Eric Berry, on behalf of all of the defendants below, requested the instruction in these words: "The instruction I would ask for would be from [*Heckstall v. State,*] 120 Md.App. 621, 707 A.2d 953

In *Mitchell v. State*, 363 Md. 130, 767 A.2d 844 (2001), the Court of Appeals summarized the requirements for proof of conspiracy. A criminal conspiracy consists of the combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means. The conspiracy may be shown by circumstantial evidence from which a common design may be inferred. To demonstrate that there has been a meeting of the minds—a unity of purpose and design—the State must show that: (1) the parties to the conspiracy gave the matter sufficient thought, however brief or impulsive, to appreciate or articulate the objective of the conspiracy; and (2) the parties, by word or by gesture, understood and agreed to cooperate to achieve the objective of the conspiracy. *Id.* at 145–46, 767 A.2d 844.

In *Heckstall v. State*, 120 Md.App. 621, 626, 707 A.2d 953 (1998), we concluded that, "standing alone, a single buyer-seller transaction ordinarily does not constitute a conspiracy," and we held that, because the evidence at Heckstall's trial was limited to a single sale of a small amount of heroin, the evidence was legally insufficient to sustain his conviction of conspiracy. Appellants acknowledge that our holding in *Heckstall* was narrow and based on the facts of that case. They urge us nonetheless to recognize a "somewhat broader 'buyer-seller' doctrine[,]" and then find reversible error in the court's refusal in this case to instruct the jury on that doctrine. We decline to do so.

 Maryland Rule 4–325(c) requires the trial court to give a requested instruction under the following circumstances: "(1) the requested instruction is a correct statement of the law; (2) the requested instruction is applicable under the facts of the case; and (3) the content of the requested instruction was not fairly covered elsewhere in the jury instruction actually given." *Ware v. State*, 348 Md. 19, 58, 702 A.2d 699 (1997). Moreover, a trial court need not give a

---

[ (1998) ], and that says standing alone a single buyer-seller transaction ordinarily does not constitute a conspiracy."

requested instruction if the instructions given fairly cover the same subject matter. *Binnie v. State*, 321 Md. 572, 581–83, 583 A.2d 1037 (1991); *Brooks v. State*, 104 Md.App. 203, 211, 655 A.2d 1311, *cert. denied*, 339 Md. 641, 664 A.2d 885 (1995).

Here, the court fully instructed the jury on what constitutes a conspiracy; the court was not required to explain to the jury what does *not* constitute a conspiracy. To be sure, discrete portions of the evidence, when divorced from the larger evidentiary context, do reflect some "single buyer-seller transactions." Yet it strains credulity to suggest that the requested buyer-seller instruction is fairly generated under the facts of this case.

The federal courts of appeal have held that defendants are not entitled to the buyer-seller instruction in circumstances like those in the present case. *See, e.g., United States v. Martinez–Medina*, 279 F.3d 105, 120 (1st Cir.) (holding that the evidence did not "plausibly" support a buyer-seller instruction, because "overwhelming evidence showed that [defendants] agreed to import drugs with the intent to distribute them, and engaged in repeated transactions of large quantities of narcotic drugs for resale"), *cert. denied sub nom. Perez–Colon v. United States*, 536 U.S. 932, 122 S.Ct. 2608, 153 L.Ed.2d 794 (2002); *United States v. Span*, 170 F.3d 798, 801 (7th Cir.) (holding that conspiracy instruction accurately stated the law and properly "emphasized the necessity of finding a conspiratorial agreement," even though the instruction omitted defendant's requested statement that an agreement between a buyer and seller of illegal drugs does not constitute conspiracy), *cert. denied*, 528 U.S. 862, 120 S.Ct. 153, 145 L.Ed.2d 130 (1999); *United States v. Jones*, 160 F.3d 473, 481–82 (8th Cir.1998) (holding that defendant was not entitled to buyer-seller instruction in drug conspiracy prosecution, given evidence that defendant "played numerous roles in the conspiracy," and that "massive amounts of cocaine were involved"); *United States v. Starnes*, 109 F.3d 648, 651 (10th Cir.) (holding that defendant was not entitled to buyer-seller instruction, despite defendant's contention that buyer-seller transactions were the only contacts between defendant and

alleged coconspirator, "because the government adduced far more evidence than the prior drug purchases to establish the conspiracy," and instructions as a whole did not allow jury to convict on mere buyer-seller theory), *cert. denied,* 521 U.S. 1128, 117 S.Ct. 2529, 138 L.Ed.2d 1029 (1997); *United States v. Mills,* 995 F.2d 480, 485 (4th Cir.) (drug conspiracy defendant was not entitled to instruction on buyer-seller defense where facts showed that relationship of parties went beyond that of mere buyer-seller transaction), *cert. denied,* 510 U.S. 904, 114 S.Ct. 283, 126 L.Ed.2d 233 (1993); *United States v. Medina,* 944 F.2d 60, 65 (2d Cir.1991) (holding that trial court did not err in refusing to give instruction that mere buyer-seller relationship in single transaction "does not alone support a conspiracy conviction," where there was evidence of "advanced planning among the alleged conspirators to deal in wholesale quantities of drugs obviously not intended for personal use"), *cert. denied sub nom. Mata v. United States,* 503 U.S. 949, 112 S.Ct. 1508, 117 L.Ed.2d 646 (1992); *see also Riggs v. United States,* 209 F.3d 828, 832–33 (6th Cir.) (holding that defendant charged with conspiracy to manufacture marijuana and possessing marijuana with intent to distribute was not entitled to specific buyer-seller instruction, even though support for such instruction existed, because court gave a "complete instruction reciting all the elements of conspiracy"), *cert. denied,* 531 U.S. 884, 121 S.Ct. 200, 148 L.Ed.2d 140 (2000).

In the instant case, there was extensive evidence offered by the State that went to establish the existence of a complex conspiracy among all of the appellants to purchase large quantities of cocaine and re-package the drugs for sale to consumers. This evidence included not only police observations of individual transactions between some of the participants, but conversations and contacts suggesting that each had a role in the overall plan. Under these circumstances, the trial court did not err in refusing to deliver the requested buyer-seller instruction.

## II.

During jury selection, the prosecutor repeatedly complained that counsel for all of the defendants were conniving to exclude white jurors, and various defense counsel complained that the prosecutor was striking young black men. The trial court considered each situation as it arose, ruling sometimes in favor of the State and sometimes in favor of the defense. On one occasion, the court reinstated a juror struck by the State on the basis of age. On another, the trial court reinstated a juror struck by counsel for Downing, a ruling that appellants argue was error on the part of the trial court.

Initially, we address the State's claim that this issue is not preserved for appellate review because the appellants each stated that the jury panel was acceptable. This is true of the appellants other than Downing. Downing was given several opportunities to argue his point, and the trial court noted that this was being done for the sake of preservation. When Downing's attorney replied that the panel was acceptable, the trial court interjected: "Subject to my ruling." Downing's attorney then asked "to be heard again on that. Just so the record is clear."

The record is, in fact, clear that Downing's attorney and the trial court understood that Downing's argument was preserved, and that his acquiescence to the jury as empaneled was not intended to waive his objection. Consequently, Downing has preserved the issue for our review. The other appellants, however, have not. *See Gilchrist v. State,* 340 Md. 606, 618, 667 A.2d 876 (1995) (holding that a party waives complaint concerning unconstitutional exercise of peremptory challenge by stating without qualification that the jury is acceptable).[4]

---

4. Later, when trial began, it was agreed that an objection by one defense attorney was to be considered an objection by all. That agreement had not been made prior to jury selection, and we do not interpret it as a having retroactive application to objections made during jury selection.

**160**

In *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court of the United States declared that "the State's privilege to strike individual jurors through peremptory challenges, is subject to the commands of the Equal Protection Clause." *Batson* announced a three-step process for evaluating claims that peremptory challenges have been used in a manner violating the Equal Protection Clause. *Id.* at 96–98. A party claiming discrimination must first make out a *prima facie* case of purposeful discrimination, and show that the totality of the relevant facts creates an inference of discriminatory purpose. Once such a showing is made, the burden shifts to the striking party to produce neutral explanations for the exercise of its strikes. *Purkett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). If the striking party proffers a race-neutral explanation, the trial court must then decide whether there has been purposeful racial discrimination. *Id.* The third level determination of whether there has been purposeful discrimination is one of credibility, which is measured by many factors: the demeanor of counsel, the reasonableness or improbability of the explanations, and whether the proffered rationale has some basis in accepted trial strategy. *Miller–El v. Cockrell,* 537 U.S. 322, 338–39, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). "If a trial court determines that a reason given for a peremptory challenge is a pretext for purposeful discrimination and upholds a *Batson* motion, the court has 'the discretion to fashion a remedy for a *Batson* violation that addresses and resolves the specific harm caused by that violation.'" *Edmonds v. State,* 372 Md. 314, 331, 812 A.2d 1034 (2002) (citations omitted).

We afford great deference to a trial court's *Batson* rulings and findings of fact on the question of discriminatory intent. *Hernandez v. New York,* 500 U.S. 352, 364, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Such findings are overturned only when clearly erroneous. *Gilchrist,* 340 Md. at 627, 667 A.2d 876. The decisive question is whether counsel's race-neutral explanations should be believed, and the best evidence

often will be the demeanor of the attorney who exercises the challenge. *Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859.

Here, the issue was developed in the following colloquy between counsel and the court:

MR. MOORE [THE PROSECUTOR]: Your honor, two more strikes by the defense team, two more whites who didn't answer questions. Additionally, as to Mr. Rich individually, I'll note he has stricken four jurors, three whites who didn't answer questions.

I renew my assertion there is a defense effort to remove whites from the jury. The last two jurors stricken were whites who didn't answer any questions. Once again, defense consistently attempt to remove all white jurors from the jury pool.

THE COURT: Mr. Rosenberg, why did you strike him?

MR. ROSENBERG [COUNSEL FOR DOWNING]: Because he is a professor. The state could produce technical evidence and—

THE COURT: Are you ready? Are you ready? I'm reinstating him.

MS. FRASER [COUNSEL FOR VARELA]: Your honor—

THE COURT: I'm reinstating him.

MR. PURPURA [COUNSEL FOR DERRICK BERRY]: I agree with the court's ruling, [I] have no objection to the court's ruling. I do object to the state's characterization.

THE COURT: Objection noted.

MR. ROSENBERG: Let me give some other reasons, judge. It is more than that reason.

I do not have any strategy of striking white jurors. I have struck an equal amount of white jurors as [A]frican–American jurors. And the reason [I] struck this man is he is not acceptable because he is too bright. I want a jury of peers. None of these people have ever gone passed [sic] the 4th grade.

THE COURT: You made it clear. It is preserved.

Appellant Downing mounts a two-pronged attack upon the court's ruling, arguing, first, that he was not given an adequate opportunity to explain his race-neutral reasons for the strike, and, second, that the court made no express finding that the reasons that were offered were not credible. In support of the second argument, Downing cites *Parker v. State*, 365 Md. 299, 778 A.2d 1096 (2001). Neither argument has merit.

First, the exchange quoted reflects that Downing's counsel *was* given a full opportunity to explain his reasons for striking the juror in question. Second, the record *does* reflect, albeit not in the above-quoted exchange, that the court expressly found that Downing's counsel had struck the juror because of his race.

At the outset of the first of three sentencing proceedings in this case, the court put the following on the record:

Since this case was tried, I read a case called Mantise Parker v. State. . . . During the course of the trial, I just want to put this on the record and I'll put it on the record tomorrow, there were, I'll use the term several, not as many a number, discussions at the bench over the striking of certain jurors because of race. I do not recall specifically anyone's precise words, other than something that I said.

There came a point in time, and this really affects Mr. Rosenberg's client [Downing] more specifically, . . . when it appeared that a number of African–American and Caucasian jurors were being stricken. . . . I recognized, at least implicitly, and maybe not specifically, that there had been a pattern otherwise I would not ask an attorney to present a reason.

The reason I mention this Mantise Parker case is that I perceive two issues, one that there are-and I certainly recognize it, there are certainly non-race based but legally justifiable reasons, for striking jurors regardless of their color or their race or their gender.

There came a time, as I recall, when I determined it was necessary to require an explanation for the striking of and I

don't remember the number, the record would reflect that number, of white jurors. And there was a Caucasian juror, who was a professor that was stricken and I reinstated him. And I used the words, as I recall, when counsel presented a reason I said that's not acceptable. I believe the reason was that he was too intelligent.

\* \* \*

But, to get to the point without taking any more of your time, I would not have reinstated the Caucasian professor if I did not believe that he was stricken because of race. Now, I make that comment in the light of the case because, put it this way, if a motion for a new trial had been filed based on that case, I would not grant it.

\* \* \*

I thought it necessary to clarify why I made that decision and that's all I have to say about it.

It is clear from the above that the court both understood and fully satisfied its obligations under the law. The premise upon which Downing's second challenge to the court's ruling rests—that the court made no finding that the strike of the juror was based on race—fails in the face of the court's clarification of the basis for its decision to reseat the juror.

The Supreme Court made clear in *Miller–El* that deference to the trial court's findings on credibility is crucial because a reviewing court, analyzing only the transcript of the voir dire, is "not as well positioned as the trial court is to make credibility determinations." 537 U.S. at 339, 123 S.Ct. 1029. The court in the instant case discredited defense counsel's facially neutral explanation for the strike of the juror, believing instead that the strike was race-based. We ought not and therefore do not second-guess the trial court's assessment of defense counsel's credibility on that point. It follows that the court's decision to reseat the previously stricken juror was not error. *See Jones v. State,* 343 Md. 584, 605, 683 A.2d 520

(1996) (holding that it was a proper exercise of the court's discretion to reseat jurors stricken in violation of *Batson* ).

## III.

Appellants argue that the trial court erred in excluding evidence that a court, in a different and completely unrelated case, granted a motion to suppress evidence on the ground that Detectives Gladstone and Jendrick had made a false statement in a warrant application. According to defense counsel, this evidence was relevant to the credibility of the two detectives, and was admissible under the "catch all" exception to the hearsay rule. Appellants are not entitled to reversal on this ground.

This issue was discussed in an extensive bench conference among the court, the prosecutor, and counsel for appellants Eric Berry and Downing. The conference was sought by counsel for Eric Berry during his cross-examination of State's witness Detective Cannon. We find it necessary to set forth a good portion of the discussion so as to appreciate fully counsel's and the court's respective positions on the issue:

MR. NEEDLEMAN [COUNSEL FOR ERIC BERRY]: I want you to put the State on full alert of this. Your Honor, in November of the year 2000 my office was involved in a criminal matter wherein Detective Gladstone and Detective Jendrick testified. As a matter of fact, they were the agents.

As a result—let me just say the whole thing and then—as a result of that, Associate Judge of the Circuit Court for Baltimore City, M. Brooke Murdock, issued an oral opinion basically saying that she felt they were lying.

As a result of that, a case of some magnitude, the evidence was suppressed. As a result of that, Phil Jackson, who is an assistant—as you know, His Honor knows him— an assistant United States attorney filed—and I'm trying to get the right word. I don't know if it was a secret order. I can't say that he did that. But he filed an order to—

\* \* \*

MR. NEEDLEMAN: He filed a motion. And basically there was a[n] in-chambers conference that I attended. It also was attended by Tony Canavale, Michael Cannon, John Jendrick, and Keith Gladstone.

\* \* \*

MR. NEEDLEMAN: Okay. Now, they requested that Judge Murdock change the wording and change-how can I say this? I'm at a loss of words. Change what she said in that if her ruling stood, under the Jenx Act (phonetic) and under Giglio (phonetic), *United States v. Giglio,* Defense lawyers would be entitled to that evidence which showed that their officers were called a liar, and she did—well, Judge, she did so.

THE COURT: What did she do?

MR. NEEDLEMAN: I'm not too sure what she did. She just said that the evidence was suppressed on another reason.

\* \* \*

MR. NEEDLEMAN: If I—before I got into it—and I'm going to have to tell Mr. Moore that I was going to ask questions about *State of Maryland v. Antoine Manning* (phonetic), and the veracity of Keith Gladstone and John Jendrick.

The prosecutor advised the court that he too had been present at the chambers conference with Judge Murdock, and did not recall the proceedings quite as Mr. Needleman did:

MR. MOORE [THE PROSECUTOR]: What Judge Murdock did, Your Honor, was she entered an order correcting a clerk's office entry which she—the clerk's office had made an entry indicating that the judge made a finding throwing out a search warrant saying that the officer had made a false statement. Judge Murdock entered a[n] order correcting that entry saying that the officer had made a statement unintentionally. And I don't recall the exact

wording, but there is a written order in the file which the Court can see if it wants.

The point is Judge Murdock was simply correcting a docket entry by the clerk.

Mr. Needleman disputed the prosecutor's understanding of the events in question. The court then sought clarification of counsel's request:

THE COURT: You want me to allow in evidence what some other judge said? Is that what you're saying to me?

MR. NEEDLEMAN: I think you would take judicial notice of another court—of a court file. Absolutely you can.

The prosecutor acknowledged that the court could take judicial notice of a file in another case, but argued that the evidence was irrelevant to the instant proceedings. The court accepted Mr. Needleman's proffer, "as an officer of the court," that "it's something that occurred," but the court said, "that doesn't answer the question you ask in this case."

At that point, Mr. Rosenberg, counsel for appellant Downing, entered the discussion. He argued that the credibility of Detectives Gladstone and Jendrick was an issue that appellants should be permitted to explore. The parties discussed whether it would be permissible to have a third person testify about a witness's credibility. The court then determined that counsel would not be permitted to elicit the disputed evidence through Detective Cannon, apparently because it became clear that Detective Cannon, in fact, had not been at the chambers conference at issue. The discussion shifted to whether the matter could be explored through Detectives Gladstone and Jendrick themselves. This prompted the prosecutor to make a formal motion to exclude any evidence on the subject. After some discussion about whether the evidence would take the form of a mere comment on the credibility of a witness or, instead, a formal "finding" by a court concerning a witness's credibility, counsel and the court turned to whether the evidence would be admissible under Maryland Rule 5–801, the catch-all exception to the rule against the admission of hearsay.

The court observed that the line of inquiry might run afoul of the Court of Appeals' decision in *Bohnert v. State,* 312 Md. 266, 539 A.2d 657 (1988). To this, Mr. Needleman replied to the court, "Okay. Then I'll agree with you. All right." The court then said, "Well, okay, then it's overruled."

Mr. Rosenberg, however, once again argued that the issue was one of the detectives' credibility, prompting the court to repeat:

THE COURT: All right. I'm not talking about—all I'm saying is that I'm overruling it, but this has similarities to [the] reported Court of Appeals [*Bohnert* ] decision where they would not allow a psychologist—it was a child abuse case, as I recall—to give testimony that this witness was not telling the truth. And what you're offering, you're saying a judge heard the person and they believed they're not—

MR. NEEDLEMAN: Yes, sir.

THE COURT:—they're not truthful. Fine. You raise a very interesting point, but I'm not going to allow you to do it.

MR. NEEDLEMAN: Okay.

THE COURT: Thank you. Okay?

MALE VOICE: Thank you, sir.

MR. MOORE: And so the Court [is] granting the State's motion precluding that line?

THE COURT: Yeah, I'm precluding it.

MR. MOORE: Okay.

MR. NEEDLEMAN: From this witness, not forever.

MR. MOORE: Well, I would ask—

THE COURT: No. I'm going to preclude it with regard to the two other people, too.

MR. ROSENBERG: Okay. Well—

THE COURT: Mr. Rosenberg?

MR. ROSENBERG:—I'd like to address it at that time to see where it goes. No, I understand. I'm just—

THE COURT: Fine. Okay. No, fine. Fine.

■ Appellants now argue that the court erroneously precluded them from pursuing what had occurred in the proceedings before Judge Murdock, as it was relevant to the credibility of Detectives Gladstone and Jendrick. The State responds that the issue has not been preserved for our review arguing, *inter alia*, that no effort was made on the part of any of the appellants to put the matter before the jury following the bench conference. We agree.

In *Prout v. State*, 311 Md. 348, 535 A.2d 445 (1988), the Court of Appeals discussed what a party who has lost on a motion *in limine* must do to challenge that ruling on appeal. The Court explained that the preservation rules vary depending upon the nature of the trial court's ruling:

> If the trial judge admits the questionable evidence, the party who made the motion ordinarily must object at the time the evidence is actually offered to preserve his objection for appellate review. However, when the trial judge resolves these motions by clearly determining that the questionable evidence will *not* be admitted, and by instructing counsel not to proffer the evidence again during trial, the proponent of the evidence is left with nothing to do at trial but follow the court's instructions. Under these circumstances, the court's ruling controls the subsequent course of the trial and the proponent's objection is preserved for review without any further action on his part.

> \* \* \*

> Thus, when a trial judge, in response to a motion *in limine*, makes a ruling to exclude evidence that is clearly intended to be the final word on the matter, and that will not be affected by the manner in which the evidence unfolds at trial, and the proponent of the evidence makes a contemporaneous objection, his objection ordinarily is preserved under Rule 4–322(c).[5]

---

5. Former Rule 4–322 was renumbered as present Rule 4–323 on June 3, 1988.

*Id.* at 356–57, 535 A.2d 445. *Accord Reed v. State,* 353 Md. 628, 633–35, 728 A.2d 195 (1999) (restating *Prout* test for preservation of ruling on motion *in limine* ); *Simmons v. State,* 313 Md. 33, 37–38, 542 A.2d 1258 (1988) (same).

In the present case, counsel for appellant Eric Berry expressly agreed with the court's rationale that the inquiry was inadmissible under the Court of Appeals' *Bohnert* decision. When the court explained its reasoning on the subject, counsel for Eric Berry proclaimed, "Okay. Then I'll agree with you. Alright." Counsel's express agreement waives the issue for appellate review. *Green v. State,* 127 Md.App. 758, 769, 736 A.2d 450 (1999) (stating that "[b]oth the Court of Appeals and this Court have held that when a party acquiesces in the court's ruling, there is no basis to appeal from that ruling").

More problematic for appellants even than Eric Berry's express agreement with the court's rationale for disallowing the evidence is what did, and did not, occur thereafter. Later in the colloquy among the court and counsel, after the court made clear that it would not permit the inquiry through either the witness currently on the stand, Detective Cannon, or, later, Detectives Gladstone and Jendrick (should any appellant wish to call them as witnesses), counsel for appellant Downing said, "I'd like to address it at that time to see where it goes. No, I understand. I'm just—." To this the court responded, "Fine. Okay. No, fine. Fine."

At no time thereafter did counsel for Downing or, for that matter, any of the appellants attempt to call Detective Gladstone as a witness. Moreover, although Downing called Detective Jendrick in his defense case, he did not broach the matter that was the subject of the bench conference.

*Prout* teaches that, absent both a clear statement by the court when ruling on a motion *in limine* that the evidence will be excluded, *and* an objection at that time by the proponent of the excluded evidence, the proponent has waived the right to complain on appeal about the *in limine* ruling unless, following that ruling, the proponent made some effort to introduce the evidence. As we have said, even after having received the

court's "okay" to pursue the matter, none of the appellants did so. Under these circumstances, we hold that appellants have not preserved for our review their complaint that the court should have allowed them to explore what occurred during the proceedings before Judge Murdock.

## IV.

Appellants complain that the trial court permitted the jury to learn, through the State's redirect examination of Detective Bristol, that two men, Danny Bandy and Scott Vanzant, were "charged as a result of this investigation," but were not joined for trial with appellants. Appellants argue that this evidence prejudiced them in the same way as would evidence that an alleged accomplice has entered a guilty plea or been found guilty.

The short answer to this contention is that appellants did not object when, during cross-examination of Detective Bristol, counsel for Downing elicited that yet another individual, Troy Sadler, was indicted as a result of his involvement with appellants. Therefore, the jury was permitted to hear that Sadler, like Bandy and Vanzant, was charged but not tried with appellants. We shall not find reversible error when objectionable testimony is admitted if the essential contents of that objectionable testimony have already been established and presented to the jury without objection through the testimony of other witnesses. *Grandison v. State*, 341 Md. 175, 218–19, 670 A.2d 398 (1995), *cert. denied*, 519 U.S. 1027, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996).

Furthermore, we find it hard to see how appellants were harmed. The jury heard a great deal of evidence about appellants and others with whom they interacted in the drug trade. It is difficult to envision how appellants could have been unfairly prejudiced when the jury learned that some of these people with whom appellants were involved were also arrested. *Id.* at 219, 670 A.2d 398; *see also Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976) (stating that error is harmless if reviewing court is convinced, beyond a reasonable

doubt, that the error "in no way influenced the verdict"); *Hudson v. State*, 152 Md.App. 488, 510–11, 832 A.2d 834, *cert. denied*, 378 Md. 618, 837 A.2d 928 (2003) (applying harmless error standard).

## V.

[16] One of the incidents about which the prosecutor questioned various police officers was their unsuccessful attempt to apprehend appellant Buckson on July 24, 2000. As a result of this incident, Buckson's car was impounded, although he was able to flee. Detective Bristol testified that he recovered a handgun from the car, and, at one point during his testimony on the subject, appellants objected.

Appellants argue on appeal that the impermissible reference to a gun suggested that they were engaged in a type of violence that was not demonstrated by other evidence, thereby creating reversible error. They add that the prejudice resulting from that evidence was "greatly exacerbated" by the prosecutor who, when responding to counsel's objection, stated within hearing of the jury: "Your Honor, the State's position is, the State has charged these defendants with a drug conspiracy. I believe it's within this expert witness' testimony that firearms are used by drug organizations to enforce their territory."

Insofar as the admissibility of the handgun testimony is concerned, the matter is unpreserved for appellate review. On the day following the occasion on which the objection at issue was made, Detective Bristol again testified about his recovery of the handgun from Buckson's vehicle, without objection on this subject from any appellant. Neither did any appellant object when Detective Sergeant McWhite testified that he witnessed Detective Bristol recover "a plastic bag containing several gelatine capsules as well as, I believe, there was a handgun of some sort under the rear seat" of Buckson's vehicle.

Nor, on the one occasion at which an objection *was* made, did appellants object to the immediately previous testimony by

Detective Bristol concerning his recovery of the handgun from Buckson's vehicle. It was not until the prosecutor prepared to have the handgun displayed to the jury that counsel for Eric Berry objected on behalf of all appellants.

The failure to object as soon as the handgun evidence was admitted, and on each and every occasion at which the evidence was elicited, constitutes a waiver of the grounds for objection. *See* Md. Rule 4–323(a); *Fowlkes v. State*, 117 Md.App. 573, 588, 701 A.2d 862 (1997) (observing that "[c]ases are legion . . . to the effect that an objection must be made to each and every question to preserve the matter for appellate review"), *cert. denied*, 348 Md. 523, 704 A.2d 1244 (1998).

We also note that the single objection that *was* made came from counsel for Eric Berry, not counsel for Buckson. Although counsel for Eric Berry complained "on behalf of all brother counsel," he argued that the evidence was irrelevant because "it has nothing to do with Eric Berry, nothing," and "[f]or it to come in is highly prejudicial." As framed, this objection had little, if any, relationship to Buckson, in whose vehicle the handgun was found. Moreover, the objection prompted the court to instruct the jury that the handgun recovered from Buckson's vehicle was admissible only against him, and that "it should not be considered or held against the other defendants." It is presumed that jurors will follow limiting instructions. *Williams v. State*, 131 Md.App. 1, 40, 748 A.2d 1, *cert. denied*, 359 Md. 335, 753 A.2d 1032 (2000). Thus, even if the issue were preserved for review, we would discern no reversible error.

Nor do we see reversible error in the prosecutor's reaction, in the jury's presence, to the objection when it came. At the bench conference that followed, counsel for appellant Varela objected to the prosecutor's "giving his theory of expert testimony in front of the jury." The court admonished the prosecutor to desist from making such statements in front of the jury. No further relief was requested by any appellant.

In the absence of a request for relief, either in the form of a curative instruction or a mistrial, appellants have nothing

about which to complain. *See Lamb v. State*, 141 Md.App. 610, 644–45, 786 A.2d 783 (2001) (holding that where an objection is sustained and curative instruction given, and no further relief such as a mistrial, additional curative instruction, or striking of the offending comment is requested, there is nothing for the appellate court to review). In any event, we are hard pressed to find reversible error on the basis of the prosecutor's comment, particularly when appellants made no effort to have the court address that which they now say was so unfairly prejudicial to them.

## VI.

Each appellant was convicted of multiple counts of conspiracy: to distribute cocaine, to possess cocaine, and to possess cocaine with the intent to distribute it. In addition, appellant Varela was convicted of participating in the conspiracy as a drug kingpin, of importation into Maryland 28 grams or more of cocaine, possession with intent to distribute cocaine, possession of cocaine, and possession with intent to distribute more than 448 grams of cocaine.

The State agrees with appellants that only one conviction for a single conspiracy can stand, no matter how many criminal acts the conspirators have agreed to commit. *Henry v. State*, 324 Md. 204, 240, 596 A.2d 1024 (1991), *cert. denied*, 503 U.S. 972, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992); *accord Jordan v. State*, 323 Md. 151, 161, 591 A.2d 875 (1991); *Tracy v. State*, 319 Md. 452, 459, 573 A.2d 38 (1990); *Malik v. State*, 152 Md.App. 305, 337, 831 A.2d 1101, *cert. denied*, 378 Md. 618, 837 A.2d 929 (2003).

We agree with the parties that a defendant may not be convicted of more than one conspiracy simply because the conspirators had multiple objectives. This is because the gravamen of the crime of conspiracy—its unit of prosecution— "is the agreement or combination itself rather than the number of objectives." *Tracy*, 319 Md. at 459, 573 A.2d 38. We are, however, somewhat confused by appellants' raising this matter on appeal, because it appears from our read of the

record that the court, at sentencing, did precisely what appellants now claim should be done. At sentencing of appellants Buckson, Eric Berry, and Derrick Berry, the court imposed sentence on each appellant's conviction of conspiracy to distribute cocaine and, for each appellant, expressly "merged" the remaining conspiracy counts. Likewise, the court sentenced appellant Downing on only his conviction of conspiracy to distribute cocaine and merged the remaining conspiracy counts.

Nevertheless, in the event that the dispositions are not clear on this point, we shall order that the commitment records of appellants Buckson, Derrick Berry, Eric Berry, and Downing be corrected (if necessary) to show that each of these appellants' convictions for conspiracy to possess with intent to distribute cocaine, and for conspiracy to possess cocaine, are vacated.

As for appellant Varela, he was convicted and sentenced for conspiracy as a kingpin. At the State's suggestion, the court merged into the kingpin conspiracy the counts charging the "lesser" conspiracies: conspiracy to distribute cocaine, conspiracy to possess with intent to distribute cocaine, and conspiracy to possess cocaine.[6] As with the other appellants, it seems to us that appellant Varela received at sentencing precisely that to which he was entitled: he stands convicted and sentenced on the charge of conspiracy as a kingpin, the remainder of the counts charging conspiracy having merged. As we have done for the other appellants, however, we shall also do for Varela—direct that his record reflect that all conspiracy convictions, save for the kingpin conspiracy, are vacated.

---

6. We do not read appellant Varela's argument as including a challenge to his separate, concurrent sentences for the convictions of importation of 28 grams or more of cocaine, and possession with intent to distribute 448 grams or more of cocaine. We note in this regard that the court merged into these "greater" counts the counts charging possession with intent to distribute cocaine and possession of cocaine.

## VII.

Appellant Derrick Berry challenges the court's denial of his motion to suppress a plastic bag containing $26,320.00, which was seized from the car he had been driving. There was no error.

At the suppression hearing on this issue, Detective Jendrick testified that, after Demley was arrested on July 21, 2000, he agreed to try to arrange a sale to Derrick Berry, later that day, of a kilogram of cocaine worth approximately $26,000.00 to $27,000.00. According to Detective Sergeant Clifton McWhite, Demley reached Derrick Berry by telephone at approximately 6:00 p.m. and arranged to meet him "in a few minutes" at a McDonald's on Moravia Road and Bowley's Lane, a short drive from his hotel room.

Detective Sergeant McWhite drove Demley to the McDonald's parking lot. McWhite parked well away from other cars, then left Demley in the driver's seat and went into the restaurant to observe.

At approximately 6:30 p.m., a car McWhite recognized as Derrick Berry's pulled into the lot and backed into a space beside Demley. Derrick Berry was driving. There was a brief conversation between the two drivers, then Derrick Berry reached toward the floorboard of the car and displayed a plastic bag to Demley. The bag was not transparent, but, according to McWhite, it "bulged like large blocks of money would be in there."

McWhite signaled Detective Jendrick, who was parked nearby. Jendrick drove over, blocked in Derrick Berry's car, and asked him to get out. Jendrick advised Derrick Berry at that time of his *Miranda*[7] rights, but did not arrest him until later in the evening. There was a bag on the passenger seat of Derrick Berry's vehicle. McWhite retrieved the bag from the car, opened it, and found inside a tee shirt and what turned out to be more than $26,000.00 in cash.

---

7. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Derrick Berry argues that "exigent circumstances present the only possible exception" to the general dictate that searches and seizures be done pursuant to a lawfully issued warrant. He argues from this premise that, here, the police created their own exigency and therefore could not rely upon that exigency as authority for the warrantless search of Berry's car and seizure of the currency. At the same time, Berry recognizes that, "as a matter of federal constitutional law, the warrant requirement has been severely eroded where an automobile is involved."

The United States Supreme Court, in a series of cases harkening back almost 80 years, has recognized an exception to the warrant requirement that allows the police, when they have probable cause to believe a vehicle contains contraband or evidence of a crime, to search the vehicle for that contraband or evidence of a crime and seize it, without a warrant. *See Maryland v. Dyson*, 527 U.S. 465, 466–67, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (*per curiam*); *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) (*per curiam*); *California v. Carney*, 471 U.S. 386, 390, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985); *United States v. Ross*, 456 U.S. 798, 806–07, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *Carroll v. United States*, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925). It is clear from these cases that "the automobile exception does not have a separate exigency requirement: 'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more.'" *Dyson*, 527 U.S. at 467, 119 S.Ct. 2013 (citation omitted).

Berry argues that federal law is not dispositive of the issue in the Maryland courts, because federal law simply establishes a "floor" for individual rights, and the States are permitted to require greater protections. Even as he makes this argument, however, Berry acknowledges that Maryland has "usually followed an *'in pari materia'* approach in regard to rights guaranteed under the Maryland Declaration of Rights and the United States Constitution." What Berry does not say, how-

ever, is that the Maryland Court of Appeals has been unwavering in applying this approach to search and seizure cases.

Article 26 of the Maryland Declaration of Rights is the State constitution's counterpart to the Fourth Amendment.[8] The Court of Appeals has reiterated that Article 26 "is considered *in pari materia* with the Fourth Amendment, such that we accord great respect and deference to the decisions of the United States Supreme Court in interpreting the federal amendment." *Carter v. State,* 367 Md. 447, 458, 788 A.2d 646 (2002); *accord Scott v. State,* 366 Md. 121, 139, 782 A.2d 862 (2001) (declining to depart from Supreme Court jurisprudence in deciding a "knock and announce" case under Article 26 of the Declaration of Rights because, "[n]otwithstanding its lack of textual consistency with the Fourth Amendment, we have consistently construed Article 26 as being *in pari materia* with the Federal provision and have accepted as persuasive the Supreme Court's construction of the Fourth Amendment"), *cert. denied,* 535 U.S. 940, 122 S.Ct. 1324, 152 L.Ed.2d 231 (2002); *Gadson v. State,* 341 Md. 1, 8 n. 3, 668 A.2d 22 (1995) (same), *cert. denied,* 517 U.S. 1203, 116 S.Ct. 1704, 134 L.Ed.2d 803 (1996).

Despite these clear statements from the Court of Appeals that the Maryland courts "accept[] as persuasive" the Supreme Court jurisprudence in deciding search and seizure cases, Berry urges us to hold, as a matter of Maryland constitutional law, that the automobile exception includes an exigency requirement that is not required under the Fourth Amendment. He further argues that, if such a requirement is made part of Maryland law, the search and seizure that occurred in this case were unlawful, since the police orches-

---

8. Article 26 provides:

 That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

trated the events that led to their developing probable cause to search appellant's vehicle.

We decline appellant Derrick Berry's invitation to engraft onto Maryland search and seizure law a requirement that, for the automobile exception to apply, the State must show that the police did not have time to secure a warrant before performing the search. It most assuredly is not our place, but only that of the Court of Appeals, to change existing law to afford a criminal defendant greater protections under the Maryland Constitution than are required by the Fourth Amendment. We therefore apply the law as it exists in Maryland, which calls for us to follow in this case the Supreme Court's law on the subject.

As we have said, the Supreme Court has made pellucid that the automobile exception contains no exigency requirement. *Labron,* 518 U.S. at 940, 116 S.Ct. 2485; *Dyson,* 527 U.S. at 467, 119 S.Ct. 2013. Thus, so long as the police have probable cause to search an automobile for contraband—a circumstance that Berry does not suggest is absent in this case—the police may search the vehicle for that contraband.

■ There is no merit to Berry's second argument, which he presses less hard than his first (perhaps because the argument was not raised below), that the automobile exception does not apply to this case because his car was "boxed in" by police vehicles and, therefore, not readily mobile. Disposition of this argument is controlled by the Supreme Court's decision in *Carney.* There, the Court clarified that,

> although ready mobility alone was perhaps the original justification for the vehicle exception, our later cases have made clear that ready mobility is not the only basis for the exception. The reasons for the vehicle exception, we have said, are twofold. "Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office."
> *Even in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its*

*use as a readily mobile vehicle justified application of the vehicular exception.*

471 U.S. at 391, 105 S.Ct. 2066 (emphasis added) (citations omitted). It is clear from *Carney* that Derrick Berry's car met the requirement of "ready mobility," even though at the moment of the search it was "boxed in" by the police.

Viewing the evidence in the light most favorable to the State as the prevailing party on the motion to suppress, and giving due deference to the suppression court to resolve factual disputes, *State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439 (2003), we conclude in our independent review of the record that the search of Derrick Berry's car, which produced the bag of currency, was lawful by application of the automobile exception to the warrant requirement.

## VIII.

 Appellant Varela contends that the evidence was not legally sufficient to establish that he met the statutorily defined status of a kingpin. *See* Md.Code (2002), § 5–613(a) of the Criminal Law Article (defining a "drug kingpin" as "an organizer, supervisor, financier, or manager who acts as a coconspirator in a conspiracy to manufacture, distribute, dispense, transport in, or bring into the State a controlled dangerous substance"). He asks us to reverse that conviction, accordingly.

The State responds that Varela has not preserved his sufficiency challenge for our review because he did not state with particularity why the motion for judgment of acquittal should be granted. We agree with the State.

Maryland Rule 4–324(a) provides, in pertinent part: "A defendant may move for judgment of acquittal . . . at the close of the evidence offered by the State and, in a jury trial, at the close of all the evidence. *The defendant shall state with particularity all reasons why the motion should be granted."* (Emphasis added.) Subsection (c) of Rule 4–324 provides:

A defendant who moves for judgment of acquittal at the close of evidence offered by the State may offer evidence in

the event the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made. In so doing, the defendant withdraws the motion.

■ " '[T]he language of [Rule 4–324] is mandatory.'" *Bates v. State,* 127 Md.App. 678, 691, 736 A.2d 407, *cert. denied,* 356 Md. 635, 741 A.2d 1095 (1999) (quoting *State v. Lyles,* 308 Md. 129, 135, 517 A.2d 761 (1986)) (holding that where counsel failed to articulate below the arguments they urged on appeal regarding sufficiency of the evidence, the arguments were waived); *accord Graham v. State,* 325 Md. 398, 416–17, 601 A.2d 131 (1992); *Warfield v. State,* 315 Md. 474, 483, 554 A.2d 1238 (1989); *Byrd v. State,* 140 Md.App. 488, 494–95, 780 A.2d 1224 (2001); *Braxton v. State,* 123 Md.App. 599, 670, 720 A.2d 27 (1998).

At the close of the State's case, counsel for Varela mentioned only two grounds for Varela's motion for judgment of acquittal: (1) the conspiracy counts in separate indictments were duplicative; and (2) Demley's testimony was uncorroborated. Then, at the close of all of the evidence, counsel for Varela stated only: "I renew my motion for judgment of acquittal and I would submit on the arguments made."

Varela's motion at the close of all the evidence lacked the particularity required by Rule 4–324(a). Moreover, even if we were to treat his motion at that juncture as an adoption of the grounds stated in his motion at the end of the State's case, the result would be no different. That motion, though particular to the grounds there raised, did not remotely mention, much less argue with particularity, the argument being pressed for the first time on appeal. In short, Varela's argument is not preserved for appellate review, and we decline to consider it.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY OF THE CONVICTIONS OF CONSPIRACY TO POSSESS WITH THE INTENT TO DISTRIBUTE COCAINE, AND CONSPIRACY TO POSSESS COCAINE VACATED AS TO ALL APPELLANTS; JUDGMENT OF THE CONVICTION OF CONSPIRACY TO DISTRIBUTE**

COCAINE VACATED AS TO APPELLANT VARELA; JUDGMENTS OTHERWISE AFFIRMED.

COSTS TO BE PAID SEVEN–EIGHTHS BY APPELLANTS AND ONE–EIGHTH BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.