WATERMAN, Justice.
In this appeal, we must decide whether to abandon the automobile exception to the search warrant requirement under article I, section 8 of the Iowa Constitution. In State v. Gaskins, we did not reach that issue, but members of this court noted the rationale for the exception may be eroded by technological advances enabling police to obtain warrants from the scene of a traffic stop. 866 N.W.2d 1, 17 (Iowa 2015) (Cady, C.J., concurring specially). The defendant driver in today’s case was lawfully stopped for a seat belt violation. The deputy smelled marijuana and searched the vehicle, discovering marijuana packaged for resale. The defendant was charged with possession with intent to deliver in violation of Iowa Code section 124.401(l)(d) (2015). He filed a motion to suppress, claiming this warrantless search violated the Iowa Constitution because police can now obtain warrants electronically from the side of the road. The district court denied the motion after an evidentia-ry hearing that included testimony that it would have taken well over an hour to obtain a search warrant. The defendant was convicted, and we retained his appeal.
On our review, we conclude, based on the evidence in the record, that this deputy was unable to obtain a warrant electronically from the scene of the traffic *142 stop, and the procedures in place at that time required a warrant application to be presented in person to a judicial officer. For the reasons further explained below, we elect to retain the automobile exception, consistent with our precedent, federal caselaw, and the overwhelming majority of other states. We are guided by the decisions of other states that abandoned the automobile exception only to reinstate it. Their experience shows the easy-to-apply automobile exception is preferable to the alternative—a less predictable, case-by-case exigency determination resulting in prolonged roadside seizures awaiting a warrant, with attendant dangers and no net gain for civil liberties. We may' revisit this issue at a future time when roadside electronic warrants have become more practical. Today, we affirm the district court’s ruling denying the defendant’s motion to suppress and defendant’s conviction.
I. Background Facts and Proceedings.
On the afternoon of. April 19, 2015, sheriffs deputy Clay Leonard was on patrol in Dallas County at the intersection of Highway 141 and Wendover. He saw a male driving a dark-colored Chevrolet pickup truck without wearing a seat belt. The deputy activated his emergency lights'to stop the driver. He reported to dispatch the location of the traffic stop, about a twenty-five-minute drive from the Dallas County courthouse. He walked to the driver’s side window and asked for the lone occupant’s license and registration. As they talked, he noticed that the driver, Christopher Storm, “appeared to be nervous, hands shaking and quick labored breaths.” Deputy Leonard “could smell the distinct odor of marijuana coming from the vehicle.” He brought Storm back to the front seat of his patrol car for questioning. Storm made a call on his cell phone, and two of his acquaintances arrived. Storm initially denied smoking marijuana or having- any in his, truck, but after further discussion, he admitted to using marijuana previously and having a criminal record. Over Storm’s objection, Deputy Leonard searched the truck. He found several packages of marijuana, a scale, a grinder, a pipe, an e-cigarette with residue, and pills in an unmarked bottle. These items were removed, and Storm was placed under arrest. One of Storm’s acquaintances drove his truck away after the arrest.
The marijuana found in Storm’s truck totaled forty-seven grams. The fourteen pills in the unmarked bottle were amphetamine/dextroamphetamine, with no prescription. Storm’s cell phone had text messages showing he had been selling marijuana. The State charged Storm by trial information with possession with intent to deliver marijuana in violation of Iowa Code section 124,401(l)(d); tax stamp violations under sections 453B.1, 453B.3, 453B.4, and 453B.12; and unlawful possession of a prescription drug in violation of section 155A.21,
Storm filed a motion to suppress. He argued that a warrantless search of a vehicle based solely upon probable cause no longer comports with article I, section 8 of the Iowa Constitution because new technology enables officers to file warrant applications at the scene of the traffic stop. The State resisted, and the district court conducted an evidentiary hearing.
Deputy Leonard and Lieutenant Adam Infante testified for the State. Deputy Leonard testified that it is a “routine occurrence” that he is the only law enforcement officer “dealing with multiple individuals or suspects.” If he has to call for assistance, it could be thirty to forty minutes before another officer arrives. When he stopped Storm, Deputy Leonard had a *143 personal cell phone, a department-issued flip phone, and an in-car computer. His internet connection was “slow” at that location. He lacked the equipment to remotely obtain a warrant.
Deputy Leonard also testified about the time needed to write a search warrant application:
Q. How long, in your experience, has it taken you to author search warrants? A. By the time I get back to the police department or my office ... to type it up, make phone calls, get ahold of a county attorney to look over it, review it—I also have to get assistance because I’m not, I don’t do it all the time, so I either have a detective or somebody else - that writes them up assist me.
And then, after making phone calls, getting ahold of them, sending the document back and forth maybe to fix, grammatically fix a couple things or something, then the judge signs it.
Most of the time I have to go to the judge’s house if it’s after hours. It’s 5, 6 hours by the time I get everything done and be able to execute the warrant.
He noted how having to write a warrant in the patrol car would change this process:
Well, typing up documents, trying to put everything into the document that’s required by law, and trying to watch somebody or what’s' going on at the scene, or timewise, et cetera, is—I mean, it takes away from me being able to keep observation around me, keep me safe, et cetera.
Lieutenant Infante, who estimated he had written “hundreds” of warrants, testified it would take him, in a “[bjare-bones case,” “about an hour.” He outlined the complexity of the warrant process:
First thing you need to do in the search warrant is identify with specificity the item or property to be searched. In this case a vehicle make, model, VIN, license plate, color, location of the vehicle, that sort.of thing.
Next step would be to determine the items that you’re looking for in said vehicle. Which, once again, has to be fairly specific.
After that I would lay out my affidavit for why I believe there’s probable cause to search the vehicle for the items that I’m looking for.
The next step would be to add an attachment B if there was any sort of outside information that I might have received from another law enforcement officer or informant of some sort.
In Dallas County the judges prefer that we .assist them- with filling out the endorsement, where in some other counties that’s not the case. Then I would contact the county attorney to get their approval of the search warrant, to discuss any details or items that I might have left out. And then after I have had the county attorney’s approval I would then begin the arduous task of tracking down a judge.
He testified tracking down a judge can be difficult, whether it is, “3 or. 4 o’clock in the morning” or “3 o’clock in the afternoon” because they are often involved in other business such as hearings, appearances, or conferences.
Lieutenant Infante acknowledged he takes a “cautious” approach to search warrants, explaining the importance of accuracy:
I’ve lost a search warrant in this very courtroom before for not-being correct. You only have one opportunity to write a search warrant and get it signed by á judge. Once it’s signed, sealed, that’s it. You don’t get an opportunity to go back .and edit it or make corrections or change anything.
*144 If he had to apply for a search warrant from his squad car, “It would be hard for [him to] do a good job. It would be hard for [him] to be accurate with having to pay attention to [the driver] and also keep an eye on the property to be searched.” He noted the challenge of multitasking while using the in-car computer:
There’s a misconception that these in-car computers are, you know you’re going to sit there and you’re going to write all your reports on this in-car computer. That’s not the case. These computers issue citations, warnings; they do some accidents. A scanner is involved in that. The entering on the computer is minimal.
We’re not typing an affidavit on our in-car computer. We’re going back to the office where we can sit down, face a computer, do it correctly.
These deputies are turned sideways; they’re [not looking] out the side of the window to make sure nobody hits them; they’re watching the guy in the back seat. The in-car computer is not what people think it is.
Lieutenant Infante also testified there was no process for submitting warrants electronically to judges in Dallas County.
Storm presented testimony from Bryan Barker, a criminal defense attorney and former police officer and prosecutor, who estimated he could fill out a warrant application in fifteen minutes. However, Barker qualified his testimony by stating he would be making extensive use of “boilerplate.” He noted it likely would take another “15 to ... 30 minutes” to get approval from a judge, assuming the warrant could be sent electronically and the judge was available, for a total of thirty to forty-five minutes.
The district court denied Storm’s motion to suppress, concluding that Iowa statutes and rules “expressly anticipate that [a] warrant application will be signed under oath in the actual physical presence of the judge or magistrate.” The district court applied the automobile exception, stating, “Under these circumstances, mobility of the vehicle was more than a theoretical or presumed problem,” and “[a] very real possibility existed that the vehicle would be driven away from this location before a warrant could be obtained by any means.” The district court made a factual finding that “Deputy Leonard did not have available to him at the time and place of this search the technology or training that would have allowed submission” of an electronic warrant.
Storm was convicted of possession with intent to deliver at a bench trial on the minutes of testimony. He was given a suspended prison sentence of no more than five years and placed on two years of probation. He appealed, and we retained the appeal.
II. Standard of Review.
“When a defendant challenges a district court’s denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo.” State v. Brown, 890 N.W.2d 315, 321 (Iowa 2017). We look to the entire record and “make ‘an inde pendent evaluation of the totality of the circumstances.’ ” Id. (quoting In re Prop. Seized from Pardee, 872 N.W.2d 384, 390 (Iowa 2015)). ‘We give deference to the district court’s fact findings due to its opportunity to assess the credibility of the witnesses, but we are not bound by those findings.” Id. (quoting Pardee, 872 N.W.2d at 390).
III. Analysis.
Storm asks us to abandon the automobile exception, contending its rationale has been eroded by new technology allow- *145 tag warrants to be obtained promptly from the scene of the traffic stop. On our de novo review, we find the evidentiary record belies Storm’s factual premise. Like the district court, we find that Deputy Leonard lacked the capability to obtain a search warrant from the scene of the traffic stop and that it would have taken over an hour to get a warrant to search Storm’s truck. Based on this evidentiary record and our survey of precedent nationwide, we retain the automobile exception and affirm the district court.
A. The Automobile Exception’s History and Rationales. “The Supreme Court has recognized a ‘specifically established and well-delineated’ exception to the warrant requirement for searches of automobiles and their contents.” State v. Allensworth, 748 N.W.2d 789, 792 (Iowa 2008) (quoting California v. Acevedo, 500 U.S. 565, 580, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991)). “[T]his exception is applicable when probable cause and exigent circumstances exist at the time the car is stopped by police.” State v. Holderness, 301 N.W.2d 733, 736 (Iowa 1981). The inherent mobility of motor vehicles satisfies the exigent-circumstances requirement. Id. at 737.
The automobile exception rests on twin rationales: (1) the inherent mobility of the vehicle, and (2) the lower expectation of privacy in vehicles 'compared to homes and other structures. Allensworth, 748 N.W.2d at 793-94. There was no procedure in place in Dallas County in 2015 for Deputy Leonard to obtain a search warrant electronically from the scene of his traffic stop.[1] We decline to replace the easy-to-apply automobile exception with a case-by-case exigency determination that results in less predictable, inconsistent outcomes and prolonged seizures with roadside hazards and no net gain in liberty. Vehicles remain inherently mobile with reduced expectations of privacy, while rapid roadside warrants are not yet a realistic option. We conclude the twin rationales for the automobile exception remain valid.
1. The inherent mobility of the automobile. The United States Supreme Court first recognized the automobile' exception to the search-warrant requirement in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The Carroll Court addressed when police could search the vehicles of bootleggers suspected of transporting liquor during the Prohibition. Id. at 160, 45 S.Ct. at 287-88. After surveying federal law since the adoption of the Fourth Amendment, the Supreme Court observed,
[T]he guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically siiice the beginning of the government, as recognizing a necessary difference between the search of a store, dwelling house, or other structure' in respect of which a proper official warrant readily may be- obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be s’ought.
Id. at 153, 45 S.Ct. at 285. Given the inherent mobility of the automobile and the impracticability of securing a warrant, the Carroll Court held a warrantless *146 search would be lawful if the officer had “reasonable or probable cause for believing that the automobile which he stops and seizes has contraband.” Id. at 156, 45 S.Ct. at 286.
Forty-five 'years later in Chambers v. Maroney, the Supreme Court reaffirmed the automobile exception for a vehicle impounded and searched at the police station following the driver’s arrest. 399 U.S. 42, 48, 90 S.Ct. 1975, 1979, 26 L.Ed.2d 419 (1970). The Court reiterated. its mobility rationale, stating,
[A] search warrant [is] unnecessary where there is probable cause to search an automobile stopped on the highway; the car is movable, the occupants are alerted, and the car’s contents may never be found again if a warrant, must be obtained.
Id. at 51, 90 S.Ct. at 1981. The Chambers Court confronted the same argument Storm raises today: that a vehicle should simply be seized until a magistrate authorizes a warrant. Id. The Court observed,
Arguably, because of the preference for a magistrate’s judgment, only the immobilization of the car should be permitted until a search warrant is .obtained; arguably, only the, “lesser” intrusion is permissible until the magistrate authorizes the “greater.” But which is the “greater” and .which the “lesser” .intrusion is. itself a debatable question and, the answer may'depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car .before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.
Id. at 51-52, 90 S. Ct. at 1981. Concluding the warrantless search was constitutional, the Court emphasized that “there is little to choose. in terms of practical consequences between an immediate search without a warrant and the car’s immobilization until a warrant is obtained.” Id. at 52, 90 S.Ct. at 1981.
The Supreme Court more recently reaffirmed that exigent circumstances apart from the mobility of the vehicle are not required to justify a warrantless search. In Maryland v. Dyson, police received a tip from a reliable confidential informant that a drug dealer would be returning to Maryland in a specifically identified red rental car. 527 U.S. 465, 465, 119 S.Ct. 2013, 2013, 144 L.Ed.2d 442 (1999) (per curiam). Officers stopped and searched the vehicle, finding twenty-three grams of crack cocaine. Id. at 466, 119 S.Ct. at 2013. The Maryland Court of Special Appeals reversed the district court’s denial of the defendant’s motion to suppress, finding that although there was probable cause to conduct the search, there “was no.exigency that prevented or even made it significantly difficult for the police to obtain a search warrant.” Id. The Supreme Court reversed, noting that “under our established precedent, the ‘automobile exception’ has no separate exigency requirement.” Id. at 466, 119 S.Ct. at 2014; see also Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485, 2487, 135 L.Ed.2d 1031 (1996) (per curiam) (using the automobile exception to justify a search based only on probable cause with no additional exigency).
2. The lower expectation of privacy in automobiles. The United States Supreme Court has also justified the automobile exception based on the reduced expectation of privacy resulting from the “configuration, use and regulation of automobiles.” Arkansas v. Sanders, 442 U.S. 753, 761, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235 (1979), abrogated on other grounds by Acevedo, 500 U.S. at 575, 111 S.Ct. at 1989. Indeed, *147 “[o]ne has a lesser expectation of privacy-in a motor vehicle because its function is transportation and it seldom serves as one’s residence or as the repository. of personal effects.” Cardwell v. Lewis, 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974). Unlike a home or office, “[a] car has little capacity for escaping public scrutiny. It travels public thoroughfares where its occupants and its contents are in plain view.” Id. Furthermore,
[b]ecause of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office.
Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973). As the Supreme Court explained,
In discharging their varied responsibilities for ensuring the public safety, law enforcement officials are necessarily brought into frequent contact with automobiles. Most of this contact is distinctly noncriminal in natura Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order.
South Dakota v. Opperman, 428 U.S. 364, 367-68, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976) (citation omitted). “In the interests of public safety ... automobiles are frequently taken into police custody.” Id. at 368, 96 S.Ct. at 3097 (citation omitted). Police may impound vehicles after accidents to permit “the uninterrupted flow of traffic.” Id. Not so with a home or other structure.
The state’s interest in highway safety allows warrantless checkpoint stops without individualized reasonable suspicion. Mich. Dep’t of State Police v. Sitz, 496 U.S. 444, 455, 110 S.Ct. 2481, 2488, 110 L.Ed.2d 412 (1990). By contrast, the interest in safe neighborhoods cannot justify warrantless searches of homes or businesses on a city block. Rather, a search warrant is required to “effect an uncon-sented administrative entry into and inspection of private dwellings or commercial premises.” Opperman, 428 U.S. at 367 n.2, 96 S.Ct. at 3096 n.2 (citing Camara v. Mun. Ct., 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)).
B. Iowa’s Adoption of the Automobile Exception Under Our State Constitution. The search and seizure provisions of the Fourth Amendment to the United States Constitution[2] and article I, section 8 of the Iowa Constitution[3] are *148 virtually identical. “We may construe the Iowa Constitution differently than its federal counterpart, despite the provisions containing nearly identical language and being structured generally with the same scope, import, and purpose.” State v. Kooima, 833 N.W.2d 202, 206 (Iowa 2013). We adopted the automobile exception under article I, section 8 of the Iowa Constitution in State v. Olsen, 293 N.W.2d 216, 220 (Iowa 1980). Previously, we had required exigency separate from the mobility of the vehicle to justify a warrantless search, but we clarified that we did so because “[a]t that time some doubt existed as to, the scope of Chambers.” Id. at 219; see also State v. Schlenker, 234 N.W.2d 142, 145 (Iowa 1975) (requiring separate showing of exigency). Federal eases subsequently clarified that “[t]he exigency requirement ... is sufficiently established by the inherent mobility of the vehicle, the fact defendant was alerted, and the chance that the car’s contents might not be found again if a warrant had to be then obtained.” Olsen, 293 N.W.2d at 220. While acknowledging we were “still free to apply” our previous holdings under an independent approach to the Iowa Constitution, we were “persuaded that the state constitution should be given the same interpretation as the Federal.” Id. at 219, 220.
We have continued to follow the federal automobile exception for decades. See, e.g., Allensworth, 748 N.W.2d at 791 n.2 (rejecting an Iowa constitutional challenge to a warrantless vehicle search); State v. Maddox, 670 N.W.2d 168, 171 (Iowa 2003) (applying the automobile exception to uphold a warrantless search under the Federal and Iowa Constitutions because of a vehicle’s “inherent mobility”); Holderness, 301 N.W.2d at 737 (rejecting federal and state constitutional challenges to a warrantless vehicle search conducted at the police station); see also State v. Vance, 790 N.W.2d 775, 791 (Iowa 2010) (Cady, J., dissenting). (“This [automobile] exception has been firmly planted in our Iowa jurisprudence for over twenty years.”). We are not persuaded to chart a different course today. “Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law.” Book v. Doublestar Dongfeng Tyre Co., 860 N.W.2d 576, 594 (Iowa 2015). Storm offers no compelling reason for overruling our precedent on the automobile exception.
C. The Overwhelming Majority of State Courts Have Retained the Automobile Exception.
1. All but five states have retained the automobile exception. An overwhelming majority of states continue to adhere to the automobile exception.[4] These include *149 courts that have construed their state constitutions to allow greater protection than the Fourth Amendment. See Commonwealth v. Gary, 625 Pa. 183, 91 A.3d 102, 126 (2014) (“[A] generally enhanced concern for individual privacy” does not “translate!] into a conferral of increased privacy protection in every context in which it is asserted under [the state constitution.]”); see also Stout v. State, 320 Ark. 552, 898 S.W.2d 457, 460 (1995) (“Of course, we could hold that the Arkansas Constitution provides greater protection against unreasonable searches than does the Constitution of the United States, but we see no reason to do so.”); People v. Smith, 95 Ill.2d 412, 69 Ill.Dec. 374, 447 N.E.2d 809, 813 (1983) (noting “the Supreme Court’s interpretation of the automobile exception ... achieves a fair balance”); Commonwealth v. Motta, 424 Mass. 117, 676 N.E.2d 795, 800 (1997) (“Indeed, while it is true that we have at times concluded that art. 14 provides more protection than the Fourth Amendment, we have also followed the Supreme Court in the area of the automobile exception.”); State v. Lloyd, 129 Nev. -, 312 P.3d 467, 474 (2013) (“Although it is elementary that states may provide greater protections than required by the federal Constitution, it is at least as fundamental that such decisions should be carefully reasoned and grounded in a strong public policy.” (quoting Thomas B. McAffee et al., The Automobile Exception in Nevada: A Critique of the Harnisch Cases, 8 Nev. L.J. 622, 648 (2008) [hereinafter McAffee])). We should not simply “reflexively find ‘in favor of any new right or interpretation asserted’ under [the state search and seizure provision].” Gary, 91 A.3d at 126 (quoting Commonwealth v. Russo, 594 Pa. 119, 934 A.2d 1199, 1210 (2007)).
In State v. Rocha, the Nebraska Supreme Court this year addressed the continuing validity of the automobile exception under its state constitution. 295 Neb. 716, 890 N.W.2d 178, 207 (2017). Police found marijuana on Eric Rocha after he consented to a pat-down search during a roadway stop. Id. at 188. The officer arrested Rocha and searched his vehicle, finding methamphetamine, marijuana, two glass vials, a glass pipe, and two digital scales near the center console. Id. Rocha moved to suppress the evidence discovered during the warrantless search of the automobile. Id. at 190. Rocha argued additional exigent circumstances, beyond the vehicle’s inherent mobility, were required for a warrant-less search. Id. at 204. He asserted that when a defendant was incapable of physically moving the vehicle or destroying evidence, officers must obtain a warrant. Id. at 205. The Nebraska Supreme Court disagreed. Id. The Rocha court, after surveying federal and state decisions, concluded,
In light of the overwhelming weight of authorities, we hold that the requirement of ready mobility for the automobile exception is met whenever a vehicle that is not located on private property is capable or apparently capable of being driven on the roads or highways. This *150 inquiry does not focus on the likelihood of the vehicle’s being moved under the particular circumstances and is generally satisfied by the inherent mobility of all operational vehicles. It does not depend on whether the defendant has access to the vehicle at the time of the search or is in custody, nor on whether the vehicle has been impounded. The purpose of the ready mobility requirement is to distinguish vehicles on public property from fixed, permanént structures, in which there is a greater expectation of privacy.
Id. at 207. We reach the same conclusion.
2. Five other states that had, abandoned the automobile exception changed course and restored it. We can learn from the experiences of the five states previously requiring a separate showing of exigent circumstances that .restored the automobile exception. See Lloyd, 312 P.3d at 474; State v. Witt, 223 N.J. 409, 126 A.3d 850, 853 (2015); State v. Zwicke, 767 N.W.2d 869, 873 (N.D. 2009); Gomez v. State, 168 P.3d 1139, 1146 (Okla. Crim. App. 2007); State v. Werner, 615 A.2d 1010, 1014 (R.I. 1992). The Nevada Supreme Court reversed course after recognizing that its separate exigency requirement had produced “confusion, while doing little to enhance the protection of individual privacy interests.” Lloyd, 312 P.3d at 473 (quoting McAffee, 8 Nev. L.J. at 624). By contrast, the automobile exception was “rooted in good policy that balances private interests with the collective good, even as it provides law enforcement with clear and unequivocal guidelines for doing their jobs.” Id. at 474 (quoting McAffee, 8 Nev. L.J. at 648).
Similarly, North Dakota, Oklahoma, and Rhode Island returned to the federal standard to restore clarity in the law. Zwicke, 767 N.W.2d at 873 (“[S]ince this Court decided Meadows, the United States Supreme Court has held that ... there need not exist exigent circumstances.... [T]o the extent that Meadows can be read to require something more than mobility for exigent circumstances, we overrule- that part of our decision in that case.”); Gomez, 168 P.3d at 1145 (“Because we believe the United States Supreme Court’s decisions ... rest on sound principles, we are persuaded they should inform our construction of Article 2, § 30.... To the extent that [earlier cases] hold to the contrary, they are overruled.”); Werner, 615 A.2d at 1014 (“In light of the Supreme Court’s clarification of the exigency issue, we conclude that it is preferable to adopt one clear-cut rule to govern ‘ automobile searches and, in turn; eliminate the conflicting interpretations of article I, section 6, of the Rhode Island Constitution and the Fourth Amendment to the United States Constitution.”).
The New Jersey Supreme Court recently overruled its prior decisions that applied a “pure exigent-circumstances requirement to justify an automobile search.” Witt, 126 A.3d at 853 (citing State v. Cooke, 163 N.J. 657, 751 A.2d 92, 97 (2000), abrogated by Witt, 126 A.3d at 853). The court had used a multifactor approach. Id. at 864 (listing exigent circumstances as “the time of day; the location of the stop; the nature of the neighborhood; the unfolding of the events establishing probable cause; the ratio of officers to suspects; the existence of confederates who know the location of the car and could remove it or its contents; whether the arrest was observed by passersby who could tamper with the car or its contents; whether it would be safe to leave the car unguarded and, if not,.whether the delay that would be caused by obtaining a warrant would place the officers or the evidence at risk” (quoting State v. Pena-Flores, 198 N.J. 6, 965 A.2d 114, 128 (2009), abrogated by Witt, 126 A.3d at *151 853)). The New Jersey Supreme Court had concluded that telephonic warrants would provide an “efficient and speedy” procedure “that will be available to [officers] on the scene; that will obviate the need for difficult exigency assessments; and that will guarantee our citizens the protections that the warrant requirement affords.” Id. (quoting Pena-Flores, 965 A.2d at 132). Experience proved otherwise:
Experience and common sense persuade us that the exigent-circumstances test in Pena-Flores does not provide greater liberty or security to New Jersey’s citizens and has placed on law enforcement unrealistic and impracticable burdens. First, the multi-factor exigency formula is too complex and difficult for a reasonable police officer to apply to fast-moving and evolving events that require prompt action. Thus, we cannot expect predictable and uniform police or judicial decision-making. Second, the securing of telephonic warrants results in unacceptably prolonged roadway stops. During the warrant-application process, the occupants of a vehicle and police officers are stranded on the side of busy highways for an extended period, increasing the risk of serious injury and even death by passing traffic. If the car is impounded, then the occupants’ detention will be extended for an even longer period as a warrant is procured.
Id. at 853.
Specifically, the New Jersey court noted in 2015 that the average' time to issue a telephonic warrant was fifty-nine minutes. Id. at 869. Some troopers experienced delays of two hours.[5] Id. The Witt court recognized, “The hope that technology would reduce the .perils of roadside stops has not been realized.” Id. Prolonged encounters along the shoulder of the highway posed “unacceptable risk of serious bodily injury and death.” Id. “News reports reveal the carnage caused by cars and trucks crashing into police officers and motorists positioned on the shoulders of our highways.” Id. We decline to impose those risks on Iowa motorists and peace officers.
The New Jersey Supreme Court noted another downside to requiring warrants for roadside searches of automobiles—the pressure put on motorists to consent to the search to avoid the delay:
[O]ne of the unintended consequences of Pena-Flores is the exponential increase in police-induced consent automobile searches. The resort to consent searches *152 suggests that law enforcement does not consider time-consuming telephonic warrants or the amorphous exigent-circumstances standard to be a feasible answer to roadway automobile searches. The heavy reliance on consent searches is of great concern given the historical abuses associated with such searches and the potential for future abuses.
Id. at 853. New Jersey studies revealed that after implementing the exigent-circumstances approach, “nearly ninety-five percent of detained motorists granted a law enforcement officer’s request for consent to search.” Id. at 870 (quoting State v. Carty, 170 N.J. 632, 790 A.2d 903, 911 (2002)). The Witt court recognized the “coercive effect of a search request made to a motorist stopped on the side of a road.” Id.; see also State v. Pals, 805 N.W.2d 767, 783 (Iowa 2011) (considering that the driver was “seized in the front seat of a squad car with his own vehicle parked on the side of a public highway” as part of the coercion analysis).
Finally, the Witt court elaborated on the “difficulty presented to police officers” by the multifactor, exigent-circumstances approach. 126 A.3d at 871.
Under that standard, before conducting a warrantless roadside search, police officers must take into account a dizzying number of factors. These factors leave open such questions as “what is the acceptable ratio of officers to suspects, what should the officer know about the neighborhood, how is he to know if confederates are skulking about, and what does it mean to consider leaving the car unguarded when the car can be safely towed and impounded?”
Id. (citation omitted) (quoting Pena-Flores, 965 A.2d at 139 (Albin, J., dissenting)). Overall, the court concluded that the multi-factor approach “places significant burdens on law enforcement,” but “[o]n the other side of the ledger, [the court] did not perceive any real benefit to our citizenry by the warrant requirement in such cases.” Id. at 872. The Witt court therefore decided to reinstate the automobile exception under the New Jersey Constitution. Id. We likewise retain the automobile exception to avoid the litany of problems experienced in New Jersey under its prior multi-factor exigent-circumstances test.
3. The state court decisions cited by Storm are unpersuasive. Storm relies on the decisions of five state courts that do not recognize the automobile exception.[6] See State v. Elison, 302 Mont. 228, 14 P.3d 456, 471 (2000); State v. Sterndale, 139 N.H. 445, 656 A.2d 409, 411 (1995); State v. Gomez, 122 N.M. 777, 932 P.2d 1, 12 (1997); State v. Bauder, 181 Vt. 392, 924 A.2d 38, 50 (2007); State v. Tibbles, 169 Wash.2d 364, 236 P.3d 885, 888 (2010). These decisions are unpersuasive and distinguishable.
For example, Montana’s constitution contains an express right to privacy, separate from its search and seizure provision, that provides c‘[t]he right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.” Mont. Const, art. II, § 10. Based on *153 this “unique constitutional language,” the Montana Supreme Court determined the state constitution “affords citizens a greater right to privacy, and, therefore, provides broader protection than the Fourth Amendment in eases involving searches of private property.” Elison, 14 P.3d at 468-69. Washington’s constitution also contains an express right to privacy. See Wash. Const, art. I, § 7 (containing privacy provision stating “[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law”). The Washington Supreme Court relied on that privacy provision to require exigency. Tibbles, 236 P.3d at 889. The Iowa Constitution lacks a separate privacy provision. So does the Constitution of Pennsylvania, and that state’s supreme court declined to follow the Washington precedent for that reason. See Gary, 91 A.3d at 132.
The search and seizure provisions of the New Hampshire and Vermont Constitutions also differ textually from the Fourth Amendment. See N.H. Const. pt. 1, art. XIX (containing additional language, “all warrants to search suspected places ... are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order, in a warrant to a civil officer, to make search in suspected places, ... be not accompanied with a special designation of the persons or objects or search”); State v. Savva, 159 Vt. 75, 616 A.2d 774, 779 (1991) (noting additional language in search and seizure provision that warrants issued “without oath or affirmation first made, affording sufficient foundation for them” and without property “particularly described” are “contrary to [the right to be free from search or seizure], and ought not be granted” (quoting Vt. Const. ch. I, art. XI)). By contrast, there is no such textual difference between the search and seizure provisions of the Fourth Amendment and article I, section 8 of the Iowa Constitution. We will follow our own precedent.
D. New Technology Has Not Undermined the Validity of the Automobile Exception.
1. The automobile exception retains its validity under federal law notwithstanding decades of experience unth electronic court filings. Adherence to the automobile exception has not waned in the face of developing technology. Storm points to our statewide use of electronic court filings through the electronic data management system (EDMS). But federal courts have used electronic filing for decades and continue to apply the automobile exception to uphold warrantless searches of vehicles. See United States v. DeLeon, 689 Fed.Appx. 278, 279, 2017 WL 1828095, at *1 (5th Cir. May 4, 2017) (per curiam) (“[T]he district court correctly found that the automobile exception applied when there was probable cause to justify the search of the vehicle.”); United States v. Shackleford, 830 F.3d 751, 753 (8th Cir. 2016) (“Probable cause to believe that an automobile contains contraband or evidence of criminal activity has long been held to justify a warrantless search of the automobile and seizure of the contraband.”); United States v. White, 804 F.3d 132, 138 (1st Cir. 2015) (noting police had probable cause to search vehicle, and “[u]nder these circumstances, the automobile exception and the Fourth Amendment require nothing more”); United States v. Reaves, 796 F.3d 738, 741 (7th Cir. 2015) (“We believe the automobile exception to the Fourth Amendment’s warrant requirement is determinative.”); United States v. Alston, 598 Fed.Appx. 730, 734 (11th Cir. 2015) (“We affirm the denial of the motion to suppress alternatively under the automobile exception because officers had probable cause to believe that the vehicle contained evidence of criminal activity.”); United States v. Donahue, 764 *154 F.3d 293, 300 (3d Cir. 2014) (“The broad sweep of the automobile exception is of controlling significance in this case.... ”). We reach the same conclusion as the unanimous federal decisions and hold that EDMS in Iowa state courts has not undermined the validity of the automobile exception.
2. Technological advances have not circumvented the need to take time to produce accurate warrants. States have retained the automobile exception despite advances in technology. This spring, the Oregon Supreme Court rejected a defendant’s argument that the automobile exception should be abandoned in light of technological advances that permit speedier warrants. State v. Andersen, 361 Or. 187, 390 P.3d 992, 998 (2017). The defendant argued “warrants can now be obtained within minutes.” Id. The-Andersen court disagreed and, as we do today, relied on the record evidence.
We question the premises on which defendant’s argument rests. As an initial matter, the length of time that it takes to write a warrant application and obtain a warrant is a factual issue for the trial court, and not all warrants will take the same amount of time. Depending on the complexity of the circumstances that give rise to probable cause and the significance of the case, some warrants will require a longer time to prepare and obtain than others. In this case, the only evidence in the record is that it would have taken hours, not minutes, to prepare a warrant application and obtain a warrant. Officer McNair testified without contradiction that, “[jjust [to get a warrant] for a .cell phone it takes me several hours to write a search warrant, and go get that approved by a DA.” The officer also explained that, if the district attorney had suggestions or corrections, it could take another hour to add those corrections to the warrant application. Not only did' the trial , court implicitly credit the officer’s testimony, but defendant identifies no contrary .evidence in the record.
Id. at 998-99 (alterations in original). The Andersen court retained the automobile exception and affirmed the warrantless search. Id. at 1000. That court left open the possibility that in future cases technological advances could undermine the automobile exception for all cases or obviate its application in an individual case. Id. at 999. We exercise the same restraint today.
The Andersen court also noted the need for accuracy in search warrant applications requires time to prepare them.
Beyond that, defendant’s argument appears to assume that the only impediment to obtaining a warrant- quickly is the time that it takes to transmit a completed warrant application to a magistrate and have the magistrate review and act on the application. While technology has made it easier to prepare and transmit completed applications, the testimony in this case illustrates what our cases have recognized. An officer must prepare the warrant application before submitting it to a magistrate for approval, and the process of preparing a warrant application can sometimes entail a substantial amount of time. Affidavits submitted in support of a warrant aré subject to technical requirements that are intended, to protect citizens’ privacy....
Ultimately, not only must search warrant applications be sufficient to satisfy issuing magistrates, but they also must withstand scrutiny in later motions to suppress if evidence discovered while executing the warrant leads to a criminal prosecution. As in this case, district attorneys. may -review warrant applications drafted by officers who may be experi *155 enced in criminal matters but untrained in the law. Without that review, warrant applications might fail to comply with the technical specifications our cases have required. Those human efforts can sometimes entail substantial expenditures of time despite technological -advances.
Id. We too require accuracy in search warrant applications. As Justice Appel has emphasized,
The issuing of a search warrant— which, among other things,’ may authorize a home- invasion by authorities—is among the most delicate’ and sensitive legal process known under our constitutional system. The process of issuing a valid search warrant is not a .bureaucratic bother in which a lackadaisical, close-enough attitude toward legal requirements is good enough. Because of the gravity of the individual rights at stake and the central role of the search warrant process in protecting citizens from unwarranted intrusions by government, our review of the warrant process must be highly detailed and demanding.
State v. Angel, 893 N.W.2d 904, 912-13 (Iowa 2017) (Appel, J., dissenting). While electronic filing may save time, the officer still must take care to prepare the warrant application accurately whether he or she is in a patrol car at the scene of the stop or at a desk at the station house.
At this point, forcing an officer to draft a search warrant application while multitasking on the side of the road may jeopardize the accuracy of the warrant application and would require motorists to be detained for much longer periods. On the civil liberties side of the ledger, we perceive no meaningful net benefit to motorists being subjected to longer seizures. Our court has indeed expressed a preference for warrants. State v. Breuer, 808 N.W.2d 195, 200 (Iowa 2012). But the purposes for requiring warrants are not furthered here. For example, the particularity requirement limits the scope of the' search to “cabin police power” so police do not search places and things not described in the warrant. Id. (quoting State v. Ochoa, 792 N.W.2d 260, 273 (Iowa 2010)), That rationale does not apply when the search by definition is confined to a specific vehicle. A warrant requirement also imposes the “deliberate, impartial judgment of a judicial officer ... between the citizen and the police.” Id. at 201 (alteration in original) (quoting United States v. Grubbs, 547 U.S. 90, 99, 126 S.Ct. 1494, 1501, 164 L.Ed.2d 195 (2006)). Yet under the automobile exception, police still must have probable cause to search the vehicle. When probable cause is absent, evidence is rightfully suppressed. See State v. Tompkins, 144 Wis.2d 116, 423 N.W.2d 823, 832 (1988) (“The exclusionary rule continues to protect against unreasonable searches of an automobile; evidence obtained will not be admissible in prosecutions unless the officer had probable cause to believe the vehicle contained contraband or evidence of a committed crime.”). Requiring a warrant for an automobile search thus does little to protect privacy or advance civil liberty.
3. New technology may pose unusual difficulties- for officers, on the side of the road. While improving technology someday may allow for a different analysis, of the automobile exception, we have no. doubt that it will also pose its own difficulties for officers in roadside stops. For example, new technology allows for quicker communication between coconspirators. As the Connecticut Supreme Court noted,
[W]hen officers are forced to delay their search until a warrant is procured, while the vehicle remains accessible to the public and is potentially mobile, the possibility remains that someone—possibly someone other than the defendant—will *156 attempt either to remove the vehicle or to interfere with law enforcement efforts to maintain a secure crime scene.
State v. Winfrey, 302 Conn. 195, 24 A.3d 1218, 1226 (2011). Indeed, here, Storm called two compatriots to the scene, so Deputy Leonard was outnumbered three to one. While they caused him no trouble, the next officer on the roadside may not be so fortunate.
E. The Automobile Exception’s Bright-Line Rule Is Preferable to an Ad Hoc Exigency Analysis for Time-Sensitive Police Interactions with Motorists. The automobile exception is easy to apply, unlike its alternative—an amorphous, mul-tifactor exigent-circumstances test. We generally “prefer the clarity of bright-line rules in time-sensitive interactions between citizens and law enforcement.” State v. Hellstern, 856 N.W.2d 355, 364 (Iowa 2014). Bright-line rules are “especially beneficial” when officers “have to make .... quick decisions as to what the law requires where the stakes are high, involving public safety on one side of the ledger and individual rights on the other.” Welch v. Iowa Dep’t of Transp., 801 N.W.2d 590, 601 (Iowa 2011). The ad hoc exigency approach is the antithesis of a bright-line rule.
That which constitutes “exigent circumstances” is frequently “in the eye of the beholder,” often requiring an on-the-scene judgment call by a police officer, often under stressful circumstances. Months later, in hindsight, it might not so appear to a judge far removed in time and place from the point of decision. “Exigent circumstances,” far from being a “bright line,” is often a difficult conclusion about which reasonable minds may differ.
Tompkins, 423 N.W.2d at 833 (Ceci, J., concurring). Abandoning the automobile exception would lead to many more contested suppression hearings with inconsistent and unpredictable results.
Automobile searches are conducted on the side of the road where ad hoc judgments have critical ramifications.
In a decision that is often instantaneous, the officer must [choose] either to conduct the search and risk having the evidence suppressed at trial, immobilize the vehicle until a search warrant can be obtained, or let the suspect leave without searching the vehicle and risk the evidence being released into the community. The later choice can be a critical one if that evidence involves a large quantity of illegal narcotics or a firearm.
Elizabeth Fischer, Confusion and Inconsistencies Surrounding the Exigency Component for Warrantless Vehicle Searches Under Article I, Section 8, 2 Duq. Crim. L.J. 123, 138 (2011) (footnote omitted). Bright-line rules support predictability of result and avoid inconsistent police and judicial determinations. See id. at 139 (comparing two factually similar Pennsylvania cases with different outcomes).
“It is asking too much of law enforcement officers, who are responding to fast-moving and [fast]-evolving events, to process the type of complex and speculative information contained in [the exigent-circumstances] formula and expect uniform and consistent decision-making.” Pena-Flores, 965 A.2d at 139. We agree.
IY. Disposition.
For these reasons, we elect to retain the automobile exception at the present time. We therefore affirm the district court’s ruling denying Storm’s motion to suppress and affirm his judgment of conviction.
DISTRICT COURT JUDGMENT AFFIRMED.
*157 Cady, C.J., Mansfield, and Zager, JJ., join this opinion. Cady, C.J., files a concurring opinion. Hecht, J., files a dissenting opinion joined by Wiggins and Appel, JJ. Appel, J., files a separate dissenting opinion joined by Wiggins, J.

. The State contends that Iowa law in 2015 required in-person presentations. of warrant applications to judicial officers. We need not decide that question of statutory interpretation because under the automobile exception, no -warrant was required and the legislature this year prospectively authorized remote electronic warrants. S.F. 358, 87th G.A., 1st Sess. § 4 (Iowa 2017).

. The Fourth Amendment to the Federal Constitution provides,
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S, Const, amend. IV.

. Article I, section 8 of the Iowa Constitution provides,
The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.
Iowa Const, art. I, § 8.

. See State v. Reyna, 205 Ariz. 374, 71 P.3d 366, 369 n.5 (Ariz. Ct. App. 2003); Jackson v. State, 427 S.W.3d 607, 613 (Ark. 2013); People v. Zuniga, 372 P.3d 1052, 1056 (Colo. 2016); People v. Edwards, 836 P.2d 468, 471 (Colo. 1992); State v. Williams, 311 Conn. 626, 88 A.3d 534, 547 (2014); Reeder v. State, Nos. 552,1999, 583,1999, 2001 WL 355732, at *2 (Del. Mar. 26, 2001); State v. Betz, 815 So.2d 627, 631 (Fla. 2002); State v. Wallace, 80 Hawai'i 382, 910 P.2d 695, 714 n.16 (1996); State v. Anderson, 154 Idaho 703, 302 P.3d 328, 331 (2012); People v. Smith, 95 Ill.2d 412, 69 Ill.Dec. 374, 447 N.E.2d 809, 813 (1983); State v. Conn, 278 Kan. 387, 99 P.3d 1108, 1111-12 (2004); Chavies v. Commonwealth, 354 S.W.3d 103, 107 (Ky. 2011); State v. Crawford, 210 So.3d 268, 269 (La. 2017); State v. Melvin, 955 A.2d 245, 250 (Me. 2008); State v. Ireland, 706 A.2d 597, 599 n.2 (Me. 1998); Berry v. State, 155 Md.App. 144, 843 A.2d 93, 113 (Md. Ct. Spec. App. 2004); Commonwealth v. Dame, 473 Mass. 524, 45 N.E.3d 69, 81 (2016); People v. Kazmierczak, 461 Mich. 411, 605 N.W.2d 667, 674 (2000); State v. Lester, 874 N.W.2d 768, 771 (Minn. 2016); Moore v. State, 787 So.2d 1282, 1288 (Miss. 2001); State v. Rocha, 295 Neb. 716, 890 N.W.2d 178, 202 (2017); State v. Lloyd, 129 Nev. -, 312 P.3d 467, 474 (2013); State *149 v. Witt, 223 N.J. 409, 126 A.3d 850, 853 (2015); People v. Galak, 81 N.Y.2d 463, 600 N.Y.S.2d 185, 616 N.E.2d 842, 843-44 (1993); State v. Isleib, 319 N.C. 634, 356 S.E.2d 573, 577 (1987); State v. Zwicke, 767 N.W.2d 869, 873 (N.D. 2009); Gomez v. State, 168 P.3d 1139, 1145 (Okla. 2007); State v. Andersen, 361 Or. 187, 390 P.3d 992, 995 (2017); Commonwealth v. Gary, 625 Pa. 183, 91 A.3d 102, 136-37 (2014); State v. Werner, 615 A.2d 1010, 1014 (R.I. 1992); State v. Fischer, 873 N.W.2d 681, 689 (S.D. 2016); State v. Sweedland, 721 N.W.2d 409, 413-14 (S.D. 2006); State v. Saine, 297 S.W.3d 199, 207 (Tenn. 2009); State v. Rigby, 369 P.3d 127, 137-38 (Utah Ct. App. 2016); State v. Tompkins, 144 Wis.2d 116, 423 N.W.2d 823, 829 (1988); McKenney v. State, 165 P.3d 96, 99 n.1 (Wyo. 2007).

. Other courts have noted the complexity of obtaining remote warrants. We have observed that "[ojbtaining a warrant by telephone is fairly complicated” and "requires considerable time.” State v. Johnson, 744 N.W.2d 340, 345 (Iowa 2008) (describing the telephonic warrant application process). Other states have had similar experiences, finding the "average time for obtaining a telephone warrant” was about two hours. State v. Raymond, 274 Or.App. 409, 360 P.3d 734, 737 (2015); see also United States v. Orozco, No. 98-CR-934, 1990 WL 118287, at *3 (E.D.N.Y. 1990) (noting police testimony that a telephonic warrant "definitely” could not be obtained in-less than one and a half hours); State v. Sanchez-Loredo, 294 Kan. 50, 272 P.3d 34, 36 (2012) ("Reno County law enforcement officers made a traffic stop of Dinah Sanchez-Lore-do’s vehicle [and] detained her at the scene for approximately 75 minutes while obtaining a search warrant.”); David A. Sklansky, Quasi-Affirmative Rights in Constitutional Criminal Procedure, 88 Va. L. Rev. 1229, 1250-51 (2002) (noting that under federal law, ”[a]n officer’s decision to seek a telephonic warrant rather than to proceed without a warrant ... can mean a significant delay”). We are not persuaded by United States v. Baker, 520 F.Supp. 1080, 1084 (S.D. Iowa 1981). In Baker, the court found that police could procure an arrest warrant, not a search warrant,- in twenty minutes. Id. This was without the defendant present; so officers were able to focus their full attention on the warrant application and prepare it at a desk, not at a roadside stop. Id.

. Connecticut and Oregon follow a modified version of the automobile exception, which provides that the automobile’s mobility justifies a search of a vehicle stopped on the side of the road, but not a vehicle that has already been impounded or parked. See State v. Winfrey, 302 Conn. 195, 24 A.3d 1218, 1224 (2011); Andersen, 390 P.3d at 998. Because this was a roadside stop, these states would permit the automobile exception as justification for the warrantless search. Two other states, Hawaii and Utah, while disallowing searches of closed containers within the automobile, follow the automobile exception for the vehicle itself. See Wallace, 910 P.2d at 714 n.16; Rigby, 369 P.3d at 138.