# IN THE COURT OF APPEALS OF IOWA

———————————————

No. 24-1981
Filed January 7, 2026

———————————————

**State of Iowa,**
Plaintiff–Appellee,

v.

**John Lavern Willer,**
Defendant–Appellant.

———————————————

Appeal from the Iowa District Court for Woodbury County,
The Honorable Patrick H. Tott, Judge.

———————————————

**AFFIRMED**

———————————————

Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson,
Assistant Appellate Defender, attorneys for appellant.

Brenna Bird, Attorney General, and Joseph D. Ferrentino,
Assistant Attorney General, attorneys for appellee.

———————————————

Considered without oral argument
by Tabor, C.J., and Greer and Buller, JJ.
Opinion by Tabor, C.J.

**TABOR, Chief Judge.**

John Willer appeals his conviction for possession of marijuana, third offense, following his conditional plea of guilty. First, he challenges the constitutionality of a peace officer's order for him to exit the van in which he was a passenger.[1] Second, he contends that his admission to possessing "a little weed" should have been suppressed.

On the search-and-seizure issue, Willer acknowledges that under the Fourth Amendment, officers may—without reasonable suspicion—order passengers out of the car during an investigative stop. *See Maryland v. Wilson*, 519 U.S. 408, 410 (1997). And we decline his invitation to adopt a different standard under article I, section 8 of the Iowa Constitution.

As to the admissibility of his statement, we find no Fifth Amendment violation because Willer was not in custody as envisioned by *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), when the officer asked about the bulge in his shirt pocket. We also find that his statement was voluntary. Thus, we affirm his conviction.

## I.     Facts and Prior Proceedings

Officer Cade Gill stopped a van driven by Matthew West for a broken brake light. Because Officer Gill was participating in a field training program with the Sioux City police, he was accompanied in his patrol car by Jordan Burns, a supervising officer. As Officer Gill processed information from West, two more officers arrived on the scene. Those officers—Meghan Danielson, also doing field training, and her supervisor, Mackenzie Neely—

---

[1] Willer also argues that the State did not prove that he was armed and dangerous to justify a pat-down search. But the record does not show that peace officers ended up patting him down, so we need not address that argument.

approached the passenger side where Willer was seated. Before long, a fifth officer joined them. Officer Petersen was a K-9 handler.[2]

Officer Danielson asked Willer to roll down the window. Once he did, she asked for his identification.

While Officer Danielson checked for warrants, Officer Neely questioned Willer at the window. Willer was talking on the phone when Officer Neely asked his name. He replied "John" which was also stitched on the Jiffy Lube jacket he was wearing. Officer Neely then said: "I'm going to have you hop out for me, okay?" She asked if he had "anything that was going to stab, stick, or poke [her]" and "if he had anything illegal." He said "no." Officer Neely repeated her request that he "hop out" and instructed him to "turn around and put his hands on the car." As he opened the door and got out, Officer Neely asked if he had any pocket knives. He patted his pants pocket and said "no" prompting her to tell him: "Quit reaching for stuff."

As instructed, Willer stepped out of the passenger seat and placed his hands on the van. He started to slide his phone inside his jacket, prompting the officer to repeat, "don't reach for anything." Willer responded, "I won't." Officer Neely then shined her flashlight on a bulge in his shirt pocket. After that, she directed him to put his hands behind his back. Officer Neely didn't handcuff Willer, but she and another officer held back his arms "for a little more control."

Referring to the bulge, Officer Neely asked, "What is it?" He answered: "a little weed." She reached in his pocket and pulled out a small cylinder containing raw marijuana saying, "I'm not worried about a little bit of weed." The officer then asked whether Willer had anything else on him.

---

[2] Officer Petersen's first name does not appear in the record.

He told her about a pipe in another pocket but denied carrying any weapons. Officer Neely said Willer was not under arrest but was "not free to go" and recited his *Miranda* rights.

Beyond the broken brake light, the officers knew other things about the van when they made the stop in the early morning hours of April 1, 2024. The registered owner was the driver's wife, Mandy West, who "had a felony warrant at the time." And the officers knew the van had been "involved in a drive-by shooting" in February 2024. Officer Neely also had stopped the van in March, leading to a possession-with-intent warrant for Mandy.

Officer Neely testified that they planned to run the drug dog around the outside of the van, and the occupants could not remain inside. When asked if that was "standard policy," she replied, "That's how I have always done it, yes."

After Officer Petersen conducted the dog sniff, he finished searching Willer, finding two marijuana pipes. The police described the marijuana seized from Willer as "three small buds" weighing 3.26 grams. Because Willer had two other drug convictions, the State charged him with possession of a controlled substance, third offense, a class "D" felony under Iowa Code section 124.401(5) (2024).

Willer moved to suppress the evidence from the stop, alleging it was "obtained in violation of [his] Fourth and Fifth Amendment rights guaranteed by the U.S. Constitution and article I, section 8 of the Iowa Constitution." Willer alleged that the search of his person was "non-consensual and therefore unlawful." He also argued that his statements to

Officer Neely should be suppressed.[3] The district court denied his motion. The court found that Willer made the statement "voluntarily and not in response to a custodial interrogation," and "the actual search of [Willer] did not occur until after the marijuana was located." Thus, the district court ruled that the officers' actions did not violate Willer's constitutional rights.

After losing his suppression motion, Willer filed a conditional guilty plea. The court sentenced him to a term not to exceed five years, suspended that sentence, and placed Willer on probation for two years. He appeals. The State does not contest Willer's assertion of appellate jurisdiction. And we agree that his appeal is properly before us. *See* Iowa Code § 814.6(3) (granting jurisdiction over a conditional guilty plea when appellate adjudication of the reserved issue is in the interest of justice).

## II. Scope and Standard of Review

We review constitutional challenges de novo. *State v. McClain*, 20 N.W.3d 488, 494 (Iowa 2025). We examine the whole record and independently evaluate the totality of the circumstances. *Id.*

## III. Suppression Analysis

Willer splits his suppression argument into two sections. First, he contends the order to exit the van violated his right to be free from unreasonable search and seizure under article I, section 8 of the Iowa Constitution. As part of his search-and-seizure claim, Willer also urges that the officer did not have reasonable suspicion that he was armed and dangerous to justify a pat-down. Second, Willer argues that the district court

---

[3] In his suppression motion, Willer argued that the officers impermissibly prolonged the traffic stop. But he abandons that argument on appeal.

should have suppressed his statement to Officer Neely under either the Fifth Amendment or as involuntary under the circumstances.

### A. Did exit order and prospect of a pat-down violate Willer's right to be free from unreasonable search and seizure?

On the search-and-seizure issue, Willer complains that he was "subjected to an exit order and pat-down search without either reasonable suspicion of criminal activity or reasonable suspicion that he was armed and dangerous." He adds, "The Iowa Constitution does not permit the former, and neither the state nor federal constitution permits the latter."

We start with the exit order. Under *Pennsylvania v. Mimms,* police conducting a valid traffic stop may order the driver to alight from the vehicle for officer safety. 434 U.S. 106, 111 (1977). In *Wilson*, the Supreme Court extended that rationale to passengers. 519 U.S. at 413–15. But on appeal Willer asks whether Iowa should follow *Wilson*'s bright-line rule under article I section 8 of the Iowa Constitution.[4] In his appellate brief, Willer urged the Iowa Supreme Court to retain his case to address this issue. But the supreme court transferred the case to us.

After that transfer, we must assess whether our court may entertain Willer's invitation to forge a different path under the Iowa Constitution. If

---

[4] The State argues that Willer did not preserve error on his state constitutional claim, asserting that his only reference to being a passenger in the suppression proceeding related to his claim that officers impermissibly prolonged the stop. In his reply brief, Willer contends the exit order was part of the search and he challenged that search under both the state and federal constitutions. Assuming without deciding that Willer minimally preserved error on this claim, we proceed to the merits.

our supreme court has weighed in, we are precedent-bound.[5] *State v. Beck*, 854 N.W.2d 56, 64 (Iowa Ct. App. 2014). But when open questions are presented to us, as an intermediate appellate court, we have the power to decide them. *See Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*, 20 A.3d 468, 480 (Pa. 2011).

In our assessment, we find no state precedent to bind us. Our supreme court has not reached the issue that Willer raises. In *State v. Price-Williams*, the defendant argued that Iowa should deviate from *Wilson* and require, under the state constitution, "reasonable suspicion that criminal activity is afoot or that a passenger is armed and dangerous before an officer can order a passenger out of a vehicle." 973 N.W.2d 556, 562 (Iowa 2022) (cleaned up). The supreme court found no need to depart from federal precedent because the officer's conduct there met the heightened standard that Price-Williams requested. *Id.*; *see also State v. Hauge*, 973 N.W.2d 453, 459–60 (Iowa 2022) (taking same approach). Because *Price-Williams* and *Hauge* left the question open, we may address it here. *See State v. Spates*, No. 19-0749, 2020 WL 6156739, at *5 (Iowa Ct. App. Oct. 21, 2020) ("And so this case calls on us to plow some fairly new ground.").

On the merits, Willer asks us to join a handful of states that have rejected *Mimms* or the *Wilson* extension of *Mimms* under their state constitutions. *See State v. Kim*, 711 P.2d 1291, 1294 (Haw. 1985); *Commonwealth v. Gonsalves*, 711 N.E.2d 108, 110–11 (Mass. 1999); *State v. Bacome*, 154 A.3d 1253, 1258–60 (N.J. 2017); and *State v. Sprague*, 824 A.2d 539, 544–45 (Vt. 2003). Willer shares the concern expressed by those courts

---

[5] This concept is known as vertical stare decisis. In short, intermediate appellate courts and trial courts are bound by the decisions of their state supreme court. *See Rice v. Rice*, 533 S.W.3d 58, 62 (Tex. App. 2017).

that allowing exit orders for passengers without reasonable suspicion "invites arbitrary, if not discriminatory, enforcement." *See Sprague*, 824 A.2d at 546. Thus, Willer contends "Under article I, section 8 of the Iowa Constitution, a reasonable suspicion that criminal activity is afoot or that a passenger is armed and dangerous should be required before an officer can order a passenger out of a vehicle." And Willer maintains, as *Gonsalves* found, "[t]he safety of the police can be adequately protected" by requiring a reasonable basis to justify an exit order. 711 N.E.2d at 112. Pressing that point, Willer questions "the dominant narrative regarding the dangerousness of traffic stops," citing Jordan Blair Woods, *Policing, Danger Narratives, and Routine Traffic Stops*, 117 Mich. L. Rev. 635, 640–41 (Feb. 2019) (presenting statistics from a 2005–2014 Florida study that showed the vast majority of routine traffic stops did not result in any violence against law enforcement).

Pushing back, the State argues that the clarity of *Wilson*'s bright-line rule is preferable to Willer's proposed standard under the state constitution. The State also stresses the "legitimate and weighty" concern for police safety during traffic stops, *see Mimms*, 434 U.S. at 110, balanced against the "minor" imposition on the passenger's liberty by being ordered out of the stopped vehicle. *See Wilson*, 519 U.S. at 413–14. The State extols the "clear, workable rule" in *Wilson* and contends that Willer "offers no good reason" for our state courts to adopt a different test under the Iowa Constitution.

We agree with the State's position. As our supreme court recently reiterated, "Traffic stops remain highly dangerous today." *See State v. Woods*, 23 N.W.3d 258, 270 (Iowa 2025) (quoting *Barnes v. Felix*, 605 U.S. 73, 85 (2025) (Kavanaugh, J., concurring)). Even assuming that Professor Woods is correct that more research is needed to "evaluate dangerousness in everyday police work, including routine traffic stops," 117 Mich. L. Rev. at 710, those

future studies cannot inform our instant judgment about the protections afforded by the Iowa Constitution.

We understand that an exit order intrudes on the liberty interests of passengers like Willer. *See Wilson*, 519 U.S. at 419 (Stevens, J., dissenting) ("[T]he potential daily burden on thousands of innocent citizens is obvious."). But as the *Wilson* majority reasoned, "the passengers are already stopped." *Id*. at 414. The majority added:

> The only change in their circumstances which will result from ordering them out of the car is that they will be outside of, rather than inside of, the stopped car. Outside the car, the passengers will be denied access to any possible weapon that might be concealed in the interior of the passenger compartment. It would seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver.

*Id*.

Applied here, Willer was unable to go about his business until the police finished the license and registration checks for Matthew West, the van's driver. The extra imposition posed by Officer Neely's request that Willer "hop out" of the van was not so invasive as to outweigh the protection afforded the officer by allowing her "command of the situation." *See Arizona v. Johnson*, 555 U.S. 323, 330 (2009).

And as the State points out, our supreme court favors "the clarity of bright-line rules in time-sensitive interactions between citizens and law enforcement." *State v. Storm*, 898 N.W.2d 140, 156 (Iowa 2017) (citation omitted). The rule in *Wilson* provides more certainty to law enforcement without great sacrifice to the civil liberties of passengers like Willer. Even

under the standard Willer proposes, officers would need only reasonable suspicion to order a passenger out of a stopped vehicle. *See State v. Ochoa*, 792 N.W.2d 260, 288 (Iowa 2010) (describing reasonable suspicion as "the lowest objective standard known under the law").

At bottom, Willer has not persuaded us to depart from settled Fourth Amendment case law here. "[O]ur independent authority to construe the Iowa Constitution does not mean that we generally refuse to follow the United States Supreme Court decisions." *State v. Short*, 851 N.W.2d 474, 490 (Iowa 2014). We find that ordering Willer out of the van was permissible under article I, section 8 of the Iowa Constitution and our state precedents.

Having decided the exit order was constitutional, we turn to Willer's claim that the officers lacked reasonable suspicion that he was armed and dangerous to justify a pat-down search. As the district court found, Officer Neely discovered the marijuana in Willer's shirt pocket before she conducted a pat-down search. Once she found the marijuana, officers had probable cause to conduct a more thorough search of Willer's person. *See State v. Horton*, 625 N.W.2d 362, 367 (Iowa 2001) ("We believe a reasonably cautious person would be warranted in believing Horton was in possession of marijuana, and this satisfies the test for probable cause to arrest and search her."). Given that order of events, we need not decide whether the officer had justification to frisk Willer. Likewise, we need not consider the State's alternative argument that Willer consented to the exit order and search.

### B. Should the district court have suppressed Willer's admission to possessing marijuana as the product of an unwarned custodial interrogation or as involuntary?

Willer next argues that the district court should have suppressed his statement to Officer Neely outside the van.[6] He contends that when he confessed to possessing marijuana, he was in custody and subjected to questioning.

But Willer's statement was not the product of custodial interrogation. True, the traffic stop curtailed his "freedom of action" and constituted a seizure within the meaning of the Fourth Amendment. *Berkemer v. McCarty*, 468 U.S. 420, 436 (1984). But roadside questioning during a routine traffic stop is not custodial interrogation for *Miranda* purposes. *Id.* at 440. As the district court found, Willer was not in custody when Officer Neely asked about the object in his pocket. *See State v. Scott*, 518 N.W.2d 347, 350 (Iowa 1994). Thus, his statement was not subject to suppression under the Fifth Amendment.

As a fall back, Willer argues that his statement was "inadmissible as involuntary as a matter of due process." On this issue, the State must show by a preponderance of the evidence that Willer voluntarily gave his statement. *State v. Countryman*, 572 N.W.2d 553, 558 (Iowa 1997). To

---

[6] The State challenges Willer's preservation of error for his Fifth Amendment claim. But Willer cited the Fifth Amendment in his motion to suppress and argued that his statements were inadmissible. In resisting the motion to suppress, the county attorney argued that Willer was not in custody for *Miranda* purposes. And the district court ruled on the issue of custodial interrogation. On this record, we find error was preserved. *See Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) ("Where the trial court's ruling, as here, expressly acknowledges that an issue is before the court and then the ruling necessarily decides that issue, that is sufficient to preserve error.").

determine voluntariness, we examine the totality of circumstances. *Id*. We consider many factors, including Willer's age; whether he had experience in the criminal justice system; whether officers used deception, physical punishment, or deprivation; whether Willer understood the officer's questions; the length of the detention and interrogation; and Willer's physical and emotional reaction to interrogation. *See State v. Madsen*, 813 N.W.2d 714, 722–23 (Iowa 2012). We will find his statement to be voluntary if it was the product of "an essentially free and unconstrained choice" made when his "will was not overborne" nor his "capacity for self-determination . . . critically impaired." *Countryman*, 572 N.W.2d at 558.

Willer contends that his will was overborne because there were five uniformed officers at the scene of the stop, including a K-9 officer. Officer Neely ordered him out of the van. And when he admitted having "weed" in his pocket, she and another officer were holding his arms behind his back.

While those facts may suggest involuntariness, on balance, the totality of circumstances show that Willer's statement was voluntary. He was fifty years old and had experience with law enforcement. Nothing in the record shows that he was impaired. The officers used no deception or force. The officer's questioning was brief and to the point, and Willer appeared to understand and respond appropriately. Thus, his statement was voluntary and not subject to suppression.

**AFFIRMED.**