**IN THE COURT OF APPEALS OF IOWA**

No. 24-0168
Filed March 5, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JOSEPH NATHAN CRUZ,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Woodbury County,
Zachary Hindman, Judge.

        A criminal defendant appeals his conviction for murder in the second
degree. **AFFIRMED.**

        Pamela Wingert of Wingert Law Office, Spirit Lake, for appellant.

        Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney
General, for appellee.

        Considered by Greer, P.J., and Buller and Langholz, JJ.

**BULLER, Judge.**

Joseph Cruz appeals his conviction for second-degree murder following the shooting of Carlos Aguirre. The jury acquitted Cruz of murder for the related shooting of his cousin Anthony Williams. Cruz challenges the sufficiency of the evidence, denial of a motion to suppress, an evidentiary issue regarding a rebuttal witness, and denial of his request for a non-model instruction. We affirm.

## I.        Background Facts and Proceedings

A group of young adults were hanging out, listening to music, and drinking at the Sioux City home of sisters Quianna and Qhileigh Louis and their cousin Sarah Zavala.[1] The group included Cruz, Carlos, Anthony, Quianna, Qhileigh, Sarah, Jasmine Olsen, Natalia Guerra, Genesis Vasquez, Hector Benson, Angel Williams, Lavontae Henderson, and others.

There were at least five guns at the house that night, which witnesses testified was not particularly unusual for this group. At one point, five of the young men—Cruz, Carlos, Anthony, Angel, and Lavontae—posed for a photo, with each of the five holding a gun. They referred to Carlos's gun as a "Shadow," referring to the manufacturer: Shadow Systems. Hector recalled thinking that everyone handled the guns "with proper care" except for Cruz, who "was flaunting his shit in front of people's faces."

For most of the evening, everyone got along. But at some point, the mood in the house soured and a fight broke out. The witness accounts on the particulars of the fight and eventual shooting differ to some degree. But there are common

---

[1] On subsequent reference, we use first names to identify most of the lay witnesses and the victims because of shared last names and family relationships.

threads.  Most or all of the witnesses agreed on the following material facts and chronology:

- Cruz and Carlos had a loud verbal disagreement in the kitchen with yelling and swearing.

- The disagreement related to guns, though not all witnesses knew the specifics.

- Cruz was "angry" or "upset."

- The verbal disagreement turned into a physical fight, with Cruz and Carlos punching and shoving each other.

- At some point, Carlos had the Shadow Systems pistol in his hand and may have cocked[2] it, but he was pointing it at the ground—not at a person.

- Carlos, Cruz, and one or more of the other party attendees tussled or brawled over the gun.

- The gun ended up in Cruz's hand, and Cruz fired multiple shots.

- The shots—which witnesses numbered between three and six—were largely "one after another" or "one right after the other."

- Carlos and Anthony fell to the ground, fatally wounded or already dead.

- At the time Cruz fired the fatal shots, Carlos did not have a gun or any other weapon in hand.

The party attendees generally scattered after the shooting, but a few made observations of Cruz.  Qhileigh—who had gone to bed earlier and was awakened by the gunshots—ran out to see Cruz standing in the living room "a good [thirty] seconds and then he walked out the door."  She asked him what happened, and Cruz shrugged his shoulders and left.  Genesis saw Cruz with the gun after the shooting and thought to herself, "Jesus Christ, you just fucking shot it off.  What

---

[2] Police testimony cast some doubt on whether anyone "cocked" the Shadow Systems pistol, as it did not have a hammer.  A detective speculated that perhaps these witnesses meant Carlos was "sliding a round by racking . . . the ejection port back," which would have caused a live round to be ejected if a magazine was inserted.

makes me think you're not going to fucking do it to somebody else?" She thought Cruz was acting "[l]ike a ghost. Like he doesn't understand. He's just walking around." Hector ran away with similar thoughts to Genesis, fearing Cruz would kill him "because, shit, if it were me, I would have left no witnesses." Sarah, who left the house before the shooting, ran into Hector on her way home and observed him to be "very frantic, crying heavily." Hector told her Cruz "was mad" and that Carlos and Anthony "were shot."

After the shooting, Cruz gave (his then-girlfriend) Jasmine the Shadow Systems pistol, and he asked her to put it in a bag underneath a seat in his car. Once they made it back to Cruz's mother's house, Cruz "started screaming that he had gotten shot," and his mother took him to the hospital.

When police arrived at the crime scene, they found Carlos dead and Anthony laying on the floor with "agonal breathing," "gasping for air." Anthony was pronounced dead at the hospital. Officers described the party attendees still on-site as "hysterical," very upset, and crying. Investigators recovered multiple shell casings and fragments—from a couch, the floor near where Carlos and Anthony fell to the ground, and a kitchen table. The casings were submitted to the Iowa Division of Criminal Investigation (DCI) for testing, and forensics established the found casings were all fired by the Shadow Systems pistol.

Police promptly secured Cruz's mother's house. While executing a search warrant on the property, officers found Cruz's Kia Soul with fresh tire tracks outside. Officers looked into the back window and saw a bag under the front-passenger seat containing a gun—visible from outside the vehicle. Inside the car, they found a total of four guns plus ammunition. One of the guns was the

Shadow Systems pistol used to kill Anthony and Carlos.  In the house, they found an unspent round of ammunition that matched the caliber and brand of casings found at the crime scene, as well as bloody clothing.

Officers caught up with Cruz at the hospital, where he was seeking treatment for a gunshot wound to his upper thigh.  Cruz "kept asking for his backpack," "at least three times to three different people or staff members."  No one at the hospital knew what he was talking about.  And while there, he never mentioned self-defense or shooting Carlos and Anthony.

Detectives interviewed Cruz at the stationhouse after he was released from the hospital.  Initially, Cruz denied any involvement in the shooting.  Then he admitted there was a fight or a brawl over Carlos's gun and claimed it must have gone off while he and others were trying to disarm Carlos.  Cruz said he "got more mad" while trying to grab the gun from Carlos but maintained he didn't shoot anyone.  And he told officers he had six or seven small beers and was "kinda buzzed up" but not "drunk" or "fucked up."  While Cruz was giving detectives this version of events, they asked why he didn't "stick around" or call 911 after his friend and cousin were shot.  Cruz responded: "I didn't think nothing of it, honestly.  Like, in other words, I didn't think it was that serious."

Detectives eventually confronted Cruz regarding the implausibility of his story and, more than forty minutes into the interview, he started to claim "self-defense" because he was allegedly afraid of Carlos.  Cruz said again that they were fighting over the gun, but he added that he felt himself get shot, so he struck Carlos in the head, took his gun, and shot him.  He explained that he "just got mad" before striking Carlos.  And he claimed he intended to "shoot to scare"—

not kill. At one point, he told detectives that, before shooting Carlos, he said: "Dumbass, you killed my cousin. . . . Yeah, fuck you." Cruz mostly denied shooting Anthony but eventually agreed he could have shot him accidentally.

The state medical examiner performed autopsies on Carlos and Anthony's bodies. Anthony died of a gunshot wound the chest and the manner of death was ruled homicide. Carlos died of gunshot wounds to the head and chest, and his manner of death was also ruled homicide. Based in part on these findings, the Woodbury County Attorney charged Cruz with two counts of murder in the second degree, class "B" felonies in violation of Iowa Code section 707.3 (2022).

Angel—Cruz's cousin and Anthony's brother—testified for Cruz at trial. Angel originally told police he wasn't at the party, but later admitted he was there when questioned under oath pursuant to a county attorney subpoena. In his trial testimony, Angel agreed with much of the other witnesses' recollections, including that Cruz and Carlos had an argument about guns. And he said that Cruz was upset Carlos was "flashing" the Shadow Systems gun at the party. Where Angel's testimony differed from others was his claim that he tried to disarm Carlos and that is when the gun went off. According to Angel, he and Cruz were both wrestling with Carlos for the gun, it dropped to the ground, and Cruz picked it up. Angel testified that Carlos then "kind of not rush[ed] towards [Cruz], but he starts making his way towards [Cruz] with his hands out trying to grab the gun again. And that's where [Cruz] had shot him." While he was leaving the house, Angel overheard Cruz say, "You shot my cousin." But Angel didn't see who shot Anthony.

Two other witnesses, Carlos's ex-girlfriend and Cruz's sister, testified that Carlos was violent and aggressive when he was intoxicated. Quianna, Natalia,

and Genesis disputed that characterization in rebuttal testimony, describing Carlos's intoxicated behavior as "sweet," loving, and prone to hugging his friends and telling them how much he appreciated them.

Also on rebuttal, a detective testified about his interview with Angel after Cruz listed Angel as a defense witness. Angel told the detective that, after Cruz and Carlos fought over the gun, Cruz shot Carlos twice in the chest and once in the back of the head.

A jury found Cruz guilty of second-degree murder with regard to Carlos and acquitted him on the murder of Anthony. Cruz was sentenced to fifty years in prison with a mandatory minimum of thirty-five years before parole. He appeals.

## II. Discussion

As we understand his claims on appeal, Cruz advances challenges to the sufficiency of the evidence, a suppression ruling regarding the murder weapon, an evidentiary ruling on rebuttal evidence, and a proposed non-model jury instruction. We consider each in turn, in the context of varying standards of review.

### A. Sufficiency of the Evidence

Cruz first challenges whether the State offered sufficient evidence of malice aforethought and that he was unjustified in shooting Carlos.[3] In response, the State relies on the permissive inference flowing from Cruz's use of a dangerous

---

[3] We assume without deciding that Cruz adequately briefed this issue for our review. The merits section for this issue in his brief does not cite the record nor any legal authorities. Both deficiencies materially and substantially violate the rules of appellate procedure. *See* Iowa Rs. App. P. 6.903(2)(a)(8)(3); 6.904(4). "Rule infractions are not a trivial matter"—they add to our workload, interfere with our mandate to justly dispose of a high volume of cases, and harm judicial economy. *See State v. Lange*, 831 N.W.2d 844, 847 (Iowa Ct. App. 2013).

weapon and points to evidence of Cruz's anger, the multiple shots fired, and Cruz's changing and inculpatory stories as proof of guilt.

We review for correction of errors at law. *State v. Cahill*, 972 N.W.2d 19, 27 (Iowa 2022). "[W]e are highly deferential to the jury's verdict. The jury's verdict binds this court if the verdict is supported by substantial evidence." *Id.* (alteration in original) (quoting *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021)). "In determining whether the jury's verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *Jones*, 967 N.W.2d at 339 (citation omitted).

With regard to malice, the jury was correctly instructed that malice

> is a state of mind which leads one to intentionally do a wrongful act to the injury of another or in disregard of the rights of another out of actual hatred, or with an evil or unlawful purpose. It may be established by evidence of actual hatred, or by proof of a deliberate or fixed intent to do injury. It may be found from the acts and conduct of the defendant, and the means used in doing the wrongful and injurious act. Malice requires only such deliberation that would make a person appreciate and understand the nature of the act and its consequences, as distinguished from an act done in the heat of passion.
> "Malice aforethought" is a fixed purpose or design to do some physical harm to another which exists before the act is committed. It does not have to exist for any particular length of time.

And the jury was authorized to infer malice (among other elements) from Cruz's use of a dangerous weapon following even the briefest opportunity to deliberate. *See State v. Green*, 896 N.W.2d 770, 779–82 (Iowa 2017) (surveying history and re-affirming use of this permissive inference). Given our standard of review, evidence of Cruz's anger with Carlos is likely sufficient on its own to affirm there was malice. *See State v. Serrato*, 787 N.W.2d 462, 471 (Iowa 2010) ("We believe

that human nature is such that anger does not immediately subside . . . .").  This evidence was further buttressed by the permissive inference because Cruz used a dangerous weapon, particularly so if the jury credited one of Cruz's versions of events in which he called Carlos a "dumbass" and blamed him for Anthony's death before shooting him.  The multiple shots also weigh in favor of malice.  *See State v. Poyner*, 306 N.W.2d 716, 718 (Iowa 1981) ("The multiple wounds refute any suggestion of inadvertence or mistake and supply strong evidence of malice and intent to kill.").  As do Cruz's changing stories and false statements.  *See State v. Ernst*, 954 N.W.2d 50, 56 (Iowa 2021) ("[A] false story told by a defendant to explain or deny a material fact against him is by itself an indication of guilt . . . ." (citation omitted)).

As for Cruz's claimed justification, our law of self-defense is statutory and authorizes

> that force and no more which a reasonable person, in like circumstances, would judge to be necessary to prevent an injury or loss and can include deadly force if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat.

Iowa Code § 704.1(1).  The defense "is both subjective and objective." *State v. Elam*, 328 N.W.2d 314, 317 (Iowa 1982).  And the State bears the burden to disprove justification once properly invoked by a criminal defendant. *State v. Ellison*, 985 N.W.2d 473, 479 (Iowa 2023).  As is often true in homicides where a defendant claims self-defense, "this was a case where the jury's verdict turned on resolution of competing inferences and implicit credibility findings." *State v. Howard*, 14 N.W.3d 763, 767 (Iowa Ct. App. 2024).  While a reasonable jury could

have perhaps chosen to believe one of Cruz's versions of events in which he expressed fear of Carlos, "[a] criminal defendant is not entitled to acquittal merely because he wishes the jury had believed him" instead of other evidence. *State v. Hernandez*, No. 23-0630, 2025 WL 52424, at *3 (Iowa Ct. App. Jan. 9, 2025) (en banc). We are required to view the evidence in the light most favorable to the State, and a reasonable jury here could have concluded Cruz shot Carlos out of anger and Carlos was unarmed and non-threatening when Cruz shot him twice in the chest and once in the back of the head. This conclusion is strongly supported by evidence of Cruz's conduct after the shooting—his callous demeanor at the house and his failure to call 911, render medical assistance, or otherwise express concern for his dead friend and dying cousin—all of which are inconsistent with an honest self-defense claim. *Cf. State v. Thornton*, 498 N.W.2d 670, 673–74 (Iowa 1993) (concluding "the jury could rationally believe these were not the actions of someone who honestly believed he acted in self-defense" when the defendant fled the scene, didn't call police or ambulance, and didn't explain to his friends what happened).

We find the guilty verdict for second-degree murder was supported by substantial evidence.

### B. Motion to Suppress Fruits from Search of the Car

Next, Cruz reprises a challenge to fruits from a search of his car—namely the Shadow Systems gun found under the front-passenger seat, which was established as the murder weapon. Before trial, Cruz moved to suppress the gun, arguing that the issued search warrant only governed the residence, not any vehicles on the premises.

Testimony at the suppression hearing developed a record on what transpired before police searched Cruz's car. The district court had approved a search warrant for the address of Cruz's home authorizing police to search for "[f]irearms, ammunition, ammunition magazines, cell phones, electronic media[,] and items of venue." When police observed at least one gun in Cruz's Kia Soul, an officer spoke by phone with the district associate judge who approved the premises warrant and inquired what the judge wanted them to do. Police told the judge the vehicle was "on the property" named in the search warrant and registered to Cruz at that address, that they had found the keys to the vehicle inside the house, and that they saw a gun in a bag inside the vehicle. A detective testified— and the district court deciding the suppression issue credited—that the warrant judge administered an oath, received testimony from the detective, and directed the detective to make a handwritten annotation on the warrant reflecting the scope of the warrant included the vehicle. The suppression court found the orally directed amendment to the search warrant was constitutional but mused that whether it complied with chapter 808 was "a more difficult question." The court resolved the suppression issue by determining the original warrant authorized the search of the vehicle as the warrant reached the real property, the curtilage, and all containers therein. And the court reasoned that, even without the original warrant, the search of the vehicle was permitted by the automobile exception to the warrant requirement, as the search was supported by probable cause and the automobile supplied an inherent exigency.

Cruz's appellate brief argues "[t]he Code clearly requires a written application" and that the oral modification was impermissible. In response, the

State points out Cruz's argument does not really address the district court's ruling, which turned on the original warrant and the automobile exception. Cruz did not file a reply brief, leaving the district court's ruling unaddressed and the State's response uncontested. We could summarily affirm on this basis. *See Hyler v. Garner*, 548 N.W.2d 864, 870 (Iowa 1996) ("[O]ur review is confined to those propositions relied upon by the appellant for reversal on appeal."). But we elect to briefly engage with the merits in the interests of completeness—to the extent we can do so absent adversarial briefing. Our review is de novo, and we give deference to the district court's credibility findings. *State v. Storm*, 898 N.W.2d 140, 144 (Iowa 2017).

First, as to the original warrant, our case law recognizes that a warranted search of a residence includes vehicles parked on the premises—at least if the vehicle is associated with the resident and subject of the warrant. *See State v. Sykes*, 412 N.W.2d 578, 584 (Iowa 1987); *see also* 2 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 4.10(c) (6th ed. 2024) ("It has often been held that a search warrant authorizing the search of certain premises covers automobiles found on those premises, provided of course that the place searched in the vehicle could contain one of the items described in the search warrant." (footnote omitted)). Here, the district court found the vehicle was on the premises, the warrant authorized a search of the premises for items that could plausibly be found within the vehicle, and the vehicle was registered to Cruz—the subject of the warrant. *Sykes* thus authorized the search of Cruz's Kia Soul. *See* 412 N.W.2d at 584.

Second, probable cause that a car contains fruits of criminal activity is sufficient to justify a warrantless search pursuant to the automobile exception. *See Storm*, 898 N.W.2d at 156 (retaining the automobile exception under the Iowa Constitution); *State v. Delgado-Jimenez*, No. 19-0746, 2020 WL 115768, at *2 (Iowa Ct. App. Jan. 9, 2020) (applying the automobile exception to an unoccupied parked car). Police saw a gun in a car registered to the suspect in a double homicide perpetrated with a gun, parked outside the suspect's home. We have no trouble concluding police had probable cause, the car supplied an inherent exigency, and a warrantless search was permitted under the automobile exception.

We affirm the district court's denial of the motion to suppress. And we end our analysis of this issue by observing that we express no opinion on the propriety of an oral amendment to a written search warrant under these circumstances.

### C. Rebuttal Testimony

Cruz next challenges an evidentiary ruling allowing a police detective to testify regarding his pretrial interview of Angel, conducted after Angel was listed as a defense witness. After Cruz objected at trial, it was revealed that—apparently due to technological error—no audio recording or transcript was generated following this interview. The State urged that it was proper rebuttal evidence not subject to discovery, as Angel was not and never had been a State's witness. Following the supreme court's decision in *State v. Belken*, 633 N.W.2d 789, 794–96 (Iowa 2001), the district court ordered the State to first present the rebuttal evidence outside the presence of the jury. After hearing the evidence, the court ruled the testimony was admissible, that the State did not violate the discovery

agreement, and that Cruz could rebut the testimony with his own surrebuttal evidence if he desired.

Cruz later also argued a due process violation,[4] asserting the State had a duty to disclose both inculpatory and exculpatory evidence regarding Angel's statements. The court denied this objection, ruled there was no due process or *Brady v. Maryland*, 373 U.S. 83, 87 (1963) violation, and found no prejudice warranting a remedy in Cruz's favor. The court also read the model impeachment instruction for unsworn statements to the jury contemporaneous with the challenged testimony, making clear Angel's statements to the detective were admissible for impeachment rather than as substantive evidence.

It is not entirely clear to us whether Cruz's appellate brief asserts a discovery violation, a *Brady* violation, or something else. We address the claims as we understand them, noting the State responded to both discovery and *Brady* issues in its own brief. We review the discovery claim for abuse of discretion. *Belken*, 633 N.W.2d at 793–94. And the *Brady* issue de novo. *DeSimone v. State*, 803 N.W.2d 97, 102 (Iowa 2011).

First, as to the discovery question, we agree with the district court that the discovery agreement only applied to written or recorded "statements," and the detective's memory of Angel's oral statements was neither. We are aware of no basis under the rules that would have required the State to disclose the detective's recollection of inculpatory information learned while interviewing a defense witness. And we note this was proper rebuttal evidence, which is generally

---

[4] We assume without deciding that the due process objection was timely made.

exempted from any discovery obligation imposed on the State. *See* Iowa R. Crim. P. 2.19(2)(a). Last, even if we came out the other way on the legal question, we agree with the district court there was no prejudice to Cruz, especially given his opportunity to surrebut the evidence. No abuse of discretion lies within the discovery ruling.

Second, the *Brady* claim is not colorable. *Brady* applies only to exculpatory evidence, and it is axiomatic the State does not violate its *Brady* obligation when it fails to supply inculpatory evidence. *See, e.g.*, Brian R. Means, *Postconviction Remedies* § 36:8 (2024) ("Not surprisingly, there is no constitutional requirement that a prosecutor provide the defense with inculpatory evidence.") (also collecting cases). The district court found, and we agree, that the rebuttal evidence was inculpatory and not exculpatory. And even if we somehow found the evidence at issue exculpatory, Cruz did not articulate a coherent theory of prejudice below nor on appeal, which defeats his *Brady* claim on another prong. *See DeSimone*, 803 N.W.2d at 105 (requiring a defendant claiming a *Brady* violation to prove materiality, meaning a reasonable probability of a different outcome had the challenged evidence been disclosed). And all this aside, we also question whether the evidence was "suppressed" within the meaning of *Brady* in the first place, as it was disclosed at trial such that Cruz "knew of it in time to take advantage of it"— through surrebuttal if nothing else. *See State v. Piper*, 663 N.W.2d 894, 905 (Iowa 2003), *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010). No matter how we slice it, Cruz did not present below and has not advanced on appeal any viable *Brady* violation.

### D. Cruz's Non-Model Proposed Instruction

Last, Cruz challenges the district court's denial of his proposed non-model jury instruction that read, "The mere fact that a death or injury occurred does not mean a crime has occurred." The requested instruction was based on the bar association's civil instruction 700.8, which expresses a similar sentiment related to tort liability. The county attorney resisted giving the instruction, arguing the totality of the instructions already communicated the concept and that it need not be highlighted. The district court denied Cruz's request, citing our unpublished decision in *State v. White*, No. 22-0522, 2023 WL 5607148, at *8 (Iowa Ct. App. Aug. 30, 2023),[5] where we affirmed denial of a materially identical instruction because the instructions "as a whole" "fairly and accurately" conveyed the concept. We review for correction of errors at law. *White*, 2023 WL 5607148, at *8 n.10.

Like the district court and our sister panel in *White*, we reject Cruz's argument. First, there is no duty to give an instruction when the concept at issue is "embodied in other instructions." *See Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016) (citation omitted). Because the remainder of the instructions adequately conveyed the State's burden of proof and Cruz's presumption of innocence, the district court did not err in declining to give the instruction. We are also sensitive to the possibility that highlighting this issue through an additional instruction may have led to jury confusion or prejudiced the State, which also

---

[5] After trial but before this opinion was released, the supreme court reversed the portion of our opinion in *White* addressing confrontation of child victims under the Iowa Constitution. *See State v. White*, 9 N.W.3d 1, 6–8 (Iowa 2024). The supreme court did not address the instructional issue when it vacated the remainder of our opinion and granted a new trial.

weighs against any legal error. Further, we discern no prejudice even if we were to conclude the district court should have given Cruz's proposed instruction, as the proposed instruction "tends to state an obvious proposition" and is otherwise redundant. *See White*, 2023 WL 5607148, at \*8 (citation omitted). We affirm the district court.

### III.    Disposition

We affirm Cruz's conviction for murder in the second degree.

**AFFIRMED.**